IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NOVO NORDISK INC. and NOVO NORDISK A/S, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 17-227 (JFB) (SRF) |
| TEVA PHARMACEUTICALS USA, INC., | ) ) ) | |
| Defendant. | ) | |

## JOINT CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Plaintiffs*

SHAW KELLER LLP
John W. Shaw (#3362)
Karen E. Keller (#4489)
I.M. Pei Building
1105 North Market Street
12th Floor
Wilmington, DE 19801
jshaw@shawkeller.com
kkeller@shawkeller.com

*Attorneys for Defendant*

April 25, 2018

## TABLE OF CONTENTS

I.    INTRODUCTORY REMARKS ...............................................................................1

    A.    Plaintiffs' Introductory Remarks ...............................................................1
    B.    Defendant's Introductory Remarks .............................................................2
        1.    Nature and Stage of the Proceedings ............................................2
        2.    Statement of Facts .........................................................................3

II.    AGREED-UPON CONSTRUCTIONS ..................................................................4

    A.    "About" ........................................................................................................4

III.    DISPUTED CLAIM TERM OF THE '833 PATENT ............................................4

    A.    Introductory Remarks .................................................................................4
        1.    Plaintiffs' Introduction to the '833 Patent ...................................4
        2.    Defendant's Introduction to the '833 Patent .................................6
    B.    The "Replacing the Isotonicity Agent Previously Utilized"; "Previously Utilized Isotonicity Agent," and "Isotonicity Agent to be Replaced" Claim Terms ........................................................................................................6
        1.    Plaintiffs' Opening Position ..........................................................6
        2.    Defendant's Answering Position ....................................................9
        3.    Plaintiffs' Reply Position ............................................................13
        4.    Defendant's Sur-Reply Position ..................................................18

IV.    DISPUTED CLAIM TERMS OF THE '893 PATENT .......................................20

    A.    Introductory Remarks ...............................................................................20
        1.    Plaintiffs' Introduction to the '893 Patent .................................20
        2.    Defendant's Introduction to the '893 Patent ...............................23
    B.    "Pivot Bearing" ........................................................................................24
        1.    Plaintiffs' Opening Position ........................................................24
        2.    Defendant's Answering Position ..................................................27
        3.    Plaintiffs' Reply Position ............................................................30
        4.    Defendant's Sur-Reply Position ..................................................34
    C.    "Radial Bearing" ......................................................................................37
        1.    Plaintiffs' Opening Position ........................................................37
        2.    Defendant's Answering Position ..................................................39
        3.    Plaintiffs' Reply Position ............................................................41
        4.    Defendant's Sur-Reply Position ..................................................44
    D.    "Driving Part" ...........................................................................................46
        1.    Plaintiffs' Opening Position ........................................................46
        2.    Defendant's Answering Position ..................................................48
        3.    Plaintiffs' Reply Position ............................................................50

V.    DISPUTED CLAIM TERMS OF THE RE '956 PATENT ..................................52

    A.    "Driver" ....................................................................................................52
        1.    Plaintiffs' Opening Position ........................................................52
        2.    Defendant's Answering Position ..................................................53
        3.    Plaintiffs' Reply Position ............................................................54

B.   "Track" ...................................................................................................57
    1.   Plaintiffs' Opening Position..............................................................57
    2.   Defendant's Answering Position ......................................................58
    3.   Plaintiffs' Reply Position .................................................................59
C.   "Track Follower" .....................................................................................60
    1.   Plaintiffs' Opening Position..............................................................60
    2.   Defendant's Answering Position ......................................................61
    3.   Plaintiffs' Reply Position .................................................................61
D.   "Track Having a Length" .........................................................................63
    1.   Plaintiffs' Opening Position..............................................................63
    2.   Defendant's Answering Position ......................................................64
    3.   Plaintiffs' Reply Position .................................................................65
    4.   Defendant's Sur-Reply Position .......................................................66
VI.   CONCLUSION......................................................................................................67
  A.   Plaintiffs' Position ....................................................................................67
  B.   Defendant's Position .................................................................................67

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Advanced Fiber Techs. Trust v. J&L Fiber Servs.*,
674 F.3d 1365 (Fed. Cir. 2012)................................................................63

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003), *rev'd on other grounds*.........................48

*Autogiro Co. of Am. v. United States*,
384 F.2d 391 (Ct. Cl. 1967) ....................................................................20

*BASF Corp. v. Johnson Matthey Inc.*,
875 F.3d 1360 (Fed. Cir. 2017)...............................................................31

*CCS Fitness, Inc. v. Brunswick Corp.*,
288 F.3d 1359 (Fed. Cir. 2002)...............................................................64

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
358 F.3d 1371 (Fed. Cir. 2004)...............................................................10

*Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*,
424 F.3d 1293 (Fed. Cir. 2005)...............................................................15

*Energizer Holdings v. ITC*,
435 F.3d 1366 (Fed. Cir. 2006)..........................................................15, 16

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
93 F.3d 1572 (Fed. Cir. 1996).................................................................12

*Fisher-Price, Inc. v. Graco Children's Prods.*,
154 F. App'x 903 (Fed. Cir. 2005) ..........................................................15

*Gen. Elec. Co. v. Int'l Trade Comm'n*,
685 F.3d 1034 (Fed. Cir. 2012)...............................................................19

*Hand Held Prods., Inc. v. Amazon.com, Inc.*,
No. CV 12-768-RGA-MPT, 2014 WL 2873902 (D. Del. June 24, 2014)............18

*Hoganas AB v. Dresser Indus., Inc.*,
9 F.3d 948 (Fed. Cir. 1993).....................................................................48

*In re Packard*,
751 F.3d 1307 (Fed. Cir. 2014).........................................................10, 18

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001).................................................................................19

*Invenas Corp. v. Renesas Elecs. Corp.*,
  11-cv-448-GMS, 2013 U.S. Dist. LEXIS 101074 (D. Del. July 15, 2013) ............................33

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
  424 F.3d 1324 (Fed. Cir. 2005).................................................................................33

*K-2 Corp. v. Salomon S.A.*,
  191 F.3d 1356 (Fed. Cir. 1999).................................................................................12

*Kara Tech. Inc. v. Stamps.com Inc.*,
  582 F.3d 1341 (Fed. Cir. 2009)............................................................................26, 38

*Kumar v. Ovonic Battery Co., Inc.*,
  351 F.3d 1364 (Fed. Cir. 2003).................................................................29, 30, 56, 64

*Lizardtech, Inc. v. Earth Res. Mapping, Inc.*,
  433 F.3d 1373 (Fed. Cir. 2006).................................................................30, 33, 40

*Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*,
  370 F.3d 1354 (Fed. Cir. 2004).................................................................................17

*Microsoft Corp. v. i4i Ltd. P'ship*,
  564 U.S. 91 (2011)...................................................................................................14

*Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*,
  75 F.3d 1545 (Fed. Cir. 1996)...................................................................................35

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014)........................................................................................3, 9, 16

*Novartis Pharms. Corp. v. Actavis, Inc.*,
  No. 12-366-RGA-CJB, 2013 U.S. Dist. LEXIS 165317 (D. Del. Nov. 21,
  2013) ................................................................................................... *passim*

*O.I. Corp. v. Tekmar Co.*,
  115 F.3d 1576 (Fed. Cir. 1997).................................................................................46

*Parker-Hannifin Corp. v. Zippertubing (Japan), Ltd.*,
  06-cv-751-MPT, 2008 U.S. Dist. LEXIS 93548 (D. Del. Nov. 18, 2008) ............................14

*Pfizer Inc. v. Teva Pharms. USA, Inc.*,
  429 F.3d 1364 (Fed. Cir. 2005).................................................................................38

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ................................................. *passim*

*Renishaw PLC v. Marposs Societa' Per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998).......................................................................7, 8, 43

*SanDisk Corp v. Memorex Prods., Inc.*,
    415 F.3d 1278 (Fed. Cir. 2005)..............................................................................7, 38

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337  (Fed. Cir. 2001)..............................................................26, 48, 50, 51

*SunPower Corp. v. PanelClaw, Inc.*,
    12-cv-1633-MPT, 2016 U.S. Dist. LEXIS 116949 (D. Del. Aug. 31, 2016) .........................14

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002)............................................................................28, 32

*Tex. Instruments Inc. v. U.S. Int'l Trade Comm'n*,
    988 F.2d 1165 (Fed. Cir. 1993)...........................................................................13, 19

*Toro Co. v. White Consol. Indus., Inc.*,
    199 F.3d 1295 (Fed. Cir. 1999)...........................................................................44, 46

*TruePosition, Inc. v. Polaris Wireless, Inc.*,
    No. CV 12-646-RGA-MPT, 2014 WL 490932 (D. Del. Feb. 4, 2014)............................9, 18

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)...........................................................................6, 48, 55

*W.L. Gore & Assocs. v. C.R. Bard Inc.*,
    No. 11-515-LPS, 2014 U.S. Dist. LEXIS 110140 (D. Del. Aug. 8, 2014).................... *passim*

*Wang Labs., Inc. v. Am. Online, Inc.*,
    197 F.3d 1377 (Fed. Cir. 1999)...........................................................................34, 35

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997) ...............................................................................................12

*Watts v. XL Sys., Inc.*,
    232 F.3d 877 (Fed. Cir. 2000)...................................................................................35

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015)...........................................................................26, 32

## STATUTES AND RULES

35 U.S.C. § 112, ¶ 2 .......................................................................................................19

MPEP § 2173.05 .........................................................................................................9, 16

Plaintiffs Novo Nordisk Inc. and Novo Nordisk A/S ("Novo Nordisk") and Defendant Teva Pharmaceuticals USA, Inc. ("Teva") submit this Joint Claim Construction Brief pursuant to the Court's May 24, 2017 Scheduling Order (D.I. 17), as amended on January 5, 2018 (D.I. 33).

## I.     INTRODUCTORY REMARKS

### A.     Plaintiffs' Introductory Remarks

This case concerns Novo Nordisk's blockbuster diabetes drug Victoza[®], which Defendant Teva seeks to copy and sell before the expiration of Novo Nordisk's patents covering the drug and its delivery device. There are five patents-in-suit, but only three are at-issue in these claim construction proceedings: U.S. Patent No. 8,114,833 ("the '833 patent"), covering the improved injectable formulations used with Victoza[®]; and U.S. Patent Nos. 9,265,893 ("the '893 patent") and RE41,956 ("the RE '956 patent"), covering aspects of the "pen" patients use to inject the drug. Novo Nordisk's proposed constructions of all the disputed claim terms are rooted in the controlling intrinsic evidence, as understood by a person of ordinary skill in the art.

The only claim construction dispute regarding the '833 patent concerns method claims 23-31, which cover methods of reducing undesirable deposits and clogged injection needles. The specification describes the inventors' extensive experimental efforts to reduce those unwanted properties, including making fourteen different formulations—each containing a different "isotonicity agent," the suspected culprit—and testing them in several rounds of screening studies. The results convinced the inventors that one agent, propylene glycol, was unexpectedly the best at reducing deposits and clogs. So they chose it over the others and claimed methods of reducing deposits and clogs by "replacing the isotonicity agent previously utilized in said formulation with propylene glycol." Novo Nordisk's construction of that disputed term (and several related terms) – "utilizing propylene glycol in lieu of another isotonicity agent evaluated for use in a GLP-1 agonist pharmaceutical formulation" – is

1

consistent with all of this intrinsic evidence. In contrast, Teva's construction rigidly requires creation of a "first" formulation without propylene glycol, and a "second" formulation with propylene glycol, something the specification does not describe. Teva's noninfringement-driven approach improperly prioritizes sequence—one formulation created first, another created second—over the choice of one isotonicity agent over others based on an evaluation, which is the focus of the controlling intrinsic evidence (i.e., the specification and the claims themselves).

Teva's constructions of the disputed terms in the '893 patent seek to limit the claims to the patent's exemplary embodiment, an improper approach that is contrary to longstanding, black-letter patent law and again presumably driven by its infringement arguments. Teva takes a similar approach with the RE '956 patent, seeking to narrow the claims to specific structures disclosed in the patent, but its proposals are confusingly redundant and contradict other claim terms. In contrast, Novo Nordisk's constructions are clear, straightforward, and properly rooted in the disclosure of the specification and the other language of the claims. The Court should adopt them and reject Teva's proposals.

### B.    Defendant's Introductory Remarks

#### 1.    Nature and Stage of the Proceedings

Teva Pharmaceuticals USA, Inc. ("Teva") filed its ANDA for approval to market a generic version of Plaintiffs' Type II diabetes drug product, Victoza®. Plaintiffs Novo Nordisk Inc. and Novo Nordisk A/S (collectively, "Novo") sued Teva for infringement of a group of patents owned by Novo that allegedly cover Victoza®, including U.S. Patent No. 8,114,833 (the "'833 patent"), U.S. Patent No. 9,265,893 (the "'893 Patent), and U.S. Patent No. RE41,956 (the "RE '956 patent") (collectively, the " Markman Patents-in-Suit".)[1]

---

[1] U.S. Patent Nos. 6,268,343 (the "'343 patent"), attached hereto as Exhibit J, and 8,846,618 (the "'618 patent") are not at issue in this claim construction proceeding. Novo has other patents

## 2.    Statement of Facts

Plaintiffs deliberately drafted claims with limitations they now seek to avoid.  The group of terms in the '833 patent, which relates to formulations containing GLP-1 and methods related thereto, lack antecedent basis and suffer from indefiniteness. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129-30 (2014) ("[A] patent must be precise enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of what is still open to them.'").  The terms in the '893 and RE '956 patents (the "pen patents") relate to the pen device used to inject the diabetes drug.  Teva's proposed definitions for the disputed claims of the pen patents properly take into account the claim language and the intrinsic evidence as a whole.

Victoza®'s active ingredient is a GLP-1 analog known as liraglutide. GLP-1, an endogenous incretin hormone, triggers the release of insulin when there are elevated levels of glucose in the blood. GLP-1 has long been studied and used as an effective agent to help regulate blood sugar in patients with Type II diabetes by stimulating insulin secretion and inhibiting glucagon secretion.  (Ex. J, '343 patent, 2:10–18.)  Native GLP-1 has a very short half-life of about 2 minutes.  (*Id.* at 2:51–55.) As discovered decades ago, its amino acid structure can be modified without affecting its bioactivity.  For example, amino acids from the GLP-1 native structure may be removed or changed.  Modified GLP-1 molecules can be termed "analogs," "agonists," or "derivatives," and may also be named differently. For example, the name "GLP-1 (7-37)" indicates that amino acids at positions 1 through 6 have been removed. (*Id.* at 4:18-60.) Modifications to GLP-1 were well-known in the prior art to the patents-in-suit. (*Id.* at 4:61-67.) Modifying the native GLP-1 structure enhances the benefits of GLP-1 while also increasing the

---

listed in the Orange Book for this product, at least two of which have expired.  Those expired patents, covering the same invention as the non-pen patents-in-suit, form the basis for Defendant's obviousness-type double patenting invalidity defense.

length of time the patient enjoys such benefits.  (*Id.* at 8:13-23.)[2] GLP-1 analogs or agonists for the treatment of Type II Diabetes are administered by injection by pre-filled devices resembling "pens."  These pens typically contain a specific amount of medicine, which is injected in pre-set dosages by pressing a button on the top of the device.  The patents at issue in this case involve the GLP-1 analog in Victoza® and the device used for administration of that product.

## II.    AGREED-UPON CONSTRUCTIONS

### A.    "About"

The term appears in claims 1, 5, 6, 7, 16, 20, 21, and 22 of U.S. Patent No. 8,114,833. The term means, when used in connection with pH, "+ or – 0.1 pH units from [the stated number]."

## III.   DISPUTED CLAIM TERM OF THE '833 PATENT

### A.    Introductory Remarks

#### 1.    Plaintiffs' Introduction to the '833 Patent

The pharmaceutical formulations of the '833 patent are intended for use in injection devices.  D.I. 39, Ex. A, '833 patent at [54] ("Propylene Glycol-Containing Peptide Formulations . . . For Use in Injection Devices").  Injectable formulations often contain "isotonicity agents," which adjust the formulation's osmotic pressure to match that of the injection site in the body. D.I. 39, Ex. A, '833 patent at col.1, ll.30-34; *see also* McGraw-Hill Concise Dictionary of Modern Medicine (2002)[3] (defining "isotonic" as "referring to uniformity of osmotic pressure"). Using an injectable formulation that is not isotonic with the body at the injection site can be painful and cause other side effects.

---

[2] A lengthier presentation of this technology will be made in the tutorial phase of the Markman proceeding.

[3] Available at: https://medical-dictionary.thefreedictionary.com/isotonic (Feb. 22, 2018).

The '833 patent explains that "one of the more common isotonic agents used in such formulations is mannitol," but the inventors "observed that mannitol causes problems during . . . production," including "deposits in the production equipment and in the final product," as well as "clogging of the injection devices."  *Id.* at col.1, ll.30-45.  So they did a series of screening studies to "identify an alternative isotonic agent."  *Id.* at col.1, ll.46-49.  They prepared fourteen different formulations—one with mannitol, and the others with different isotonicity agents—and compared them in several tests:   (1) the "drop test" to examine whether droplets of the experimental formulations contained deposits upon drying; (2) the "clogging test," to assess clogging of the injection needle; and (3) the "simulated filling" test, to determine which experimental formulations caused deposits on filling equipment.  *Id.* at col.16, ll.5-30; col.16, l.60 – col.18, l.8.

The experimental results pointed to propylene glycol, which "reduced deposits in production equipment" and "reduced clogging of the injection devices relative to formulations containing other isotonicity agents," and also created no stability, microbial, or toxicity concerns. *Id.* at col.1, ll.53-57; col.3, ll.39-48; col.18, ll.10-67.  The inventors next prepared formulations of mannitol and propylene glycol for "head to head comparison studies," in which propylene glycol was again superior.  *Id.* at col.18, ll.58-59 ("head to head comparison studies"), col.19, l.1 – col.20, l.5 ("Preparation of Formulations" and results of comparison studies).  Accordingly, the inventors concluded that propylene glycol formulations were "optimal for production and for use in injection devices since they exhibit reduced deposits . . . and reduced clogging."  *Id.* at col.13, ll.30-35.  The inventors put this discovery to use by using propylene glycol in lieu of other isotonic agents in Victoza®.

### 2.    Defendant's Introduction to the '833 Patent

The '833 patent relates to "pharmaceutical formulations comprising a peptide and propylene glycol and to methods of preparing such formulations." (D.I. 39, Ex. A, '833 patent, Abstract.) In particular, the '833 patent relates to "methods for reducing the clogging of injection devices by a peptide formulation and for reducing deposits on production equipment during production of a peptide formulation" by the addition of a well-known chemical propylene glycol. (Id.) The construction of only one group of related phrases in the '833 patent claims is disputed.

### B.    The "Replacing the Isotonicity Agent Previously Utilized"; "Previously Utilized Isotonicity Agent," and "Isotonicity Agent to be Replaced" Claim Terms

#### 1.    Plaintiffs' Opening Position

| Terms | Claims | Novo Nordisk's Construction | Teva's Construction |
|---|---|---|---|
| "replacing the isotonicity agent previously utilized in said formulation with propylene glycol" | 23, 26, 29 | "utilizing propylene glycol in lieu of another isotonicity agent evaluated for use in a GLP-1 agonist pharmaceutical formulation" | Plain and Ordinary meaning, but if to be construed:<br><br>Having a first formulation that utilized an isotonicity agent other than propylene glycol and having a second formulation wherein the isotonicity agent used in the first formulation is substituted or replaced with propylene glycol. |
| "the propylene glycol-containing formulation . . . [and] the formulation containing the previously utilized isotonicity agent" | 24, 27, 30 | | |
| "isotonicity agent to be replaced by propylene glycol" | 25, 28, 31 | | |

The focus of the claim construction inquiry is understanding how a person of ordinary skill in the art would understand the term in question in light of the intrinsic evidence. *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). A patent's specification is "the single best guide to the meaning of a disputed term" and is "[u]sually . . . dispositive" of the term's meaning. *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The '833 patent's specification serves that role here for the

"replacing . . . previously utilized" terms in claims 23-31. Those claims cover "method[s] for reducing deposits" and "methods for reducing . . . clogging" by "replacing the isotonicity agent used in said formulation with propylene glycol." *See* D.I. 39, Ex. A, '833 patent, claims 23, 26, & 29. As the specification explains, the inventors discovered the claimed methods by evaluating fourteen different isotonicity agents in a battery of tests and then concluding that propylene glycol was the "optimal" agent because it "reduced [the unwanted attributes] . . . relative to formulations containing [the] other…agents." *Id.* at col.3, ll.43-48. Thus, a person of ordinary skill in the art would understand that the inventors selected propylene glycol in lieu of the other isotonic agents they tested to reduce unwanted deposits and clogging. That, therefore, is Novo Nordisk's construction: "utilizing propylene glycol in lieu of another isotonicity agent evaluated for use in a GLP-1 agonist pharmaceutical formulation."

Teva asks the Court to either (1) give the "replacing . . . previously utilized" terms their plain and ordinary meaning, without saying what that plain meaning is, or (2) construe it to mean: "having a first formulation that utilized an isotonicity agent other than propylene glycol and having a second formulation wherein the isotonicity agent used in the first formulation is substituted or replaced with propylene glycol." That construction is divorced from the intrinsic evidence and therefore incorrect. *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (a claim construction that "flies in the face" of the patent disclosure cannot be correct); s*ee also SanDisk Corp v. Memorex Prods., Inc.,* 415 F.3d 1278, 1285 (Fed. Cir. 2005) (claims are "*always* read… in view of the full specification"). There is no instance of a preexisting "first" formulation that is modified to create a "second" formulation anywhere in the '833 patent. Instead, the patent describes simultaneous making and testing of fourteen candidate formulations, leading to the selection of one, containing the best-performing isotonic agent.

Indeed, dependent claims 25, 28, and 31 make clear that the "isotonicity agent to be replaced" can include agents that were part of the fourteen-formulation screening study, further refuting Teva's two-formulation construction. *See* D.I. 39, Ex. A, '833 patent, claims 25, 28, & 31 (limiting the "isotonicity agent to be replaced" to various isotonicity agents other than mannitol used in the screening study).

Teva's construction focuses on chronology: it requires having a "first" formulation without propylene glycol, and then having a "second" modified formulation with propylene glycol. But the '833 patent's focus is not chronology; it does not describe a sequential process of formulation development, one made after the other, but instead a broad evaluation of multiple formulations, leading to use of propylene glycol over the others they made and tested because it had the best properties. This is the "replacement" they made to reduce the unwanted deposits and clogs. Teva's construction ignores this choice based on favorable properties, which the specification describes in detail, and which a person of ordinary skill in the art would recognize. In contrast, Novo Nordisk's proposal "naturally aligns with the patent's description of the invention," making it the correct construction. *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (explaining that the construction that "most naturally aligns with the patent's description of the invention will be, in the end, the correct construction").

## 2.    Defendant's Answering Position

| Terms | Claims | Novo's Construction | Teva's Construction |
|---|---|---|---|
| "replacing the isotonicity agent previously utilized in said formulation with propylene glycol" | 23, 26, 29 | "utilizing propylene glycol in lieu of another isotonicity agent evaluated for use in a GLP-1 agonist pharmaceutical formulation" | Indefinite,[4] but if to be construed:<br><br>"Having a first formulation that utilized an isotonicity agent other than propylene glycol and having a second formulation wherein the isotonicity agent used in the first formulation is substituted or replaced with propylene glycol." |
| "the propylene glycol-containing formulation . . . [and] the formulation containing the previously utilized isotonicity agent" | 24, 27, 30 | | |
| "isotonicity agent to be replaced by propylene glycol" | 25, 28, 31 | | |

These claim terms all require the replacement of a previously used isotonicity agent with propylene glycol in a GLP-1 agonist formulation. However, these terms lack antecedent basis and the specification and file history fail to inform those skilled in the art what "the previously utilized isotonicity agent"[5] is or how it limits "the scope of the invention." *Nautilus, Inc.*, 134 S. Ct. at 2124.[6] As such the claims are invalid as indefinite. In the alternative, should the Court try to construe these claims, the plain language and intrinsic evidence controls.

What the claim language requires is a first formulation that contains an isotonicity agent that serves as the comparator for the claimed formulation and a second formulation in which "the

---

[4] Teva understands that the Court entertains allegations of indefiniteness at claim construction and accordingly raises this issue at this stage. *See, e.g., TruePosition, Inc. v. Polaris Wireless, Inc.*, No. CV 12-646-RGA-MPT, 2014 WL 490932, at *12 (D. Del. Feb. 4, 2014) (finding claim indefinite at claim construction). *See also* D.I. 44. Teva reserves the right to raise this defense to other claims in the patents for which claim construction is not requested here.

[5] For ease of reference, this brief discusses "the previously utilized isotonicity agent" and "replacing the isotonicity agent previously utilized in said formulation with propylene glycol." ('833 Patent, claims 23, 26, and 29.) The analysis applies to each of the analogous terms. (*Id.* at claims 24, 25, 27, 28, 30, and 31.)

[6] *See also* MPEP 2173.05. ("A claim is indefinite when it contains words or phrases whose meaning is unclear. The lack of clarity could arise where a claim refers to 'said lever' or 'the lever,' where the claim contains no earlier recitation or limitation of a lever and where it would be unclear as to what element the limitation was making reference.") (citations omitted).

previously utilized isotonicity agent" is replaced with propylene glycol. For instance, claim 24 is directed to a method for reducing deposits on production equipment wherein a formulation containing propylene glycol causes fewer deposits than a formulation containing "the previously utilized isotonicity agent," wherein the previously utilized isotonicity agent of the original, undefined formulation has been "replaced" with propylene glycol. ('833 Patent, claim 24 ("wherein the reduction in deposits on the production equipment during production by the propylene glycol-containing formulation relative to that observed for the formulation containing the previously utilized isotonicity agent is measured…").[7] Thus, according to the plain language of the claims, there must be *some* prior formulation containing an isotonicity agent, and that isotonicity agent in the claimed formulation is replaced by propylene glycol in order for such a comparison to occur. But the previously utilized isotonicity agent and the formulation of which it is a part are undefined by the specification and language of the claims, rendering the claim at best ambiguous and certainly indefinite. Without more guidance, which the patent lacks, a POSA cannot reasonably ascertain the scope of the claimed formulation. *See In re Packard*, 751 F.3d 1307, 1314 (Fed. Cir. 2014) (holding claim indefinite where "claims have readily observable ambiguities or incoherencies within them" due to lack of antecedent basis).

To the extent the terms can be construed, Teva's construction tracks and gives meaning to the language of the claim in light of the specification, which is "the single best guide to the meaning of a disputed term" and is "[u]sually . . . dispositive" of the term's meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005). In fact, the patentees are bound to the plain language of the claim, viewed in light of the specification, even if the Plaintiffs "wish they had

---

[7] *See also* '833 Patent, claims 27, 30 and 31 (expressly requiring comparison of the properties of the formulation containing the previously utilized isotonicity agent to those of the claimed formulation.)

written" the claims differently. *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1375 (Fed. Cir. 2004) (declining to "rewrite unambiguous patent claim language" to capture what the patentees profess to have intended).

The '833 specification describes the inventors' attempts to identify "an alternative isotonicity agent to mannitol," which is "one of the more common isotonic agents used in [peptide] formulations." ('833 Patent, 1: 30-33, 1:46-47.) In pursuit of this goal, the inventors created multiple GLP-1 formulations with well-known alternative isotonicity agents (e.g., propylene glycol) to compare to a GLP-1 formulation containing mannitol. (*See id.* at 15:65–18:67.) After evaluating a number of isotonicity agents, the inventors compared propylene glycol "head to head" with mannitol and came to the obvious and predictable conclusion—replacing the previously utilized isotonicity agent (mannitol) with propylene glycol would result in minor improvements to the GLP-1 formulation. (*Id.* at 18:55-59.) Thus, propylene glycol was "found to have suitable properties as [a] replacement[] candidat[e] for mannitol." (*Id.* at 18:19–59.) In essence, the specification describes substituting or replacing the isotonicity agent in a known or prior formulation with propylene glycol to create a new or second formulation.

Similarly, the method claims at issue require "replacing the isotonicity agent previously utilized in said formulation with propylene glycol." Teva's construction accurately interprets the requirement in each of the claims at issue of a first formulation that contains an isotonicity agent that serves as the comparator for the claimed formulation and a second formulation in which "the previously utilized isotonicity agent" is replaced with propylene glycol. Moreover, as discussed, claims 24, 27, 30 and 31 *expressly* require a comparison between the properties of the claimed formulation to that of the formulation containing the previously utilized isotonicity agent. (*See, e.g.*, '833 Patent, claim 27 ("the reduction in deposits in the final product is measured by a

11

reduction in the number of vials and/or cartridges of the propylene glycol-containing formulation . . . relative to . . . the formulation containing the previously utilized isotonicity agent").) Thus, a "previously utilized" isotonicity agent (e.g. mannitol) in a first, preexisting formulation is replaced by propylene glycol in the creation of a second, later formulation, as described by each of the claims at issue. The claim language of each of claims 23, 24, and 26-31 requires *some* previous formulation for any "replacing" to occur—in other words, there must be some agent "previously utilized" for propylene glycol to replace. Any other interpretation of the claim language renders the phrase "the previously utilized isotonicity agent" nonsensical.

Plaintiffs would rewrite those claims to have them merely require that the propylene glycol is "selected" as an isotonicity agent. But "[c]ourts do not rewrite claims; instead [they] give effect to the terms chosen by the patentee." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999). Plaintiffs chose the words of their claims specifically, and thus are bound to that language. Novo's construction ignores the claim language itself along with the specification and writes out specific elements of these claims in an improper attempt to broaden the claim's scope by embracing merely the selection and any use of propylene glycol as the isotonicity agent. This cannot be correct. It is well-settled that it is improper to remove or read-out a claim limitation during claim construction. Indeed, a fundamental principle of claim construction is that "[e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997). As a result, the patentee may not read out claim limitations as it so chooses. *See, e.g.*, *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1583 (Fed. Cir. 1996) ("Ethicon need not have included this limitation in its claim. Having done so, it must live with the language it chose.").

Thus, that Plaintiffs now wish they had written it differently—by removing a limitation requiring a prior formulation that employed an isotonicity agent and replacing that other agent with propylene glycol—to broadly capture *any* formulation that uses propylene glycol instead of another isotonicity agent is of no moment; the claim says what it says. *See Tex. Instruments Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1172 (finding that "conductors arranged substantially parallel to one another" could not be construed to capture any two parallel conductors because doing so would read out "one another" as a limitation). The claims of the '833 Patent embrace a chronology, specific formulation steps, and most significantly, simply require a formulation containing "the previously utilized isotonicity agent" as a comparator to the claimed formulation; denying this ignores the claims' narrow scope. And Novo's argument that the claim permits "simultaneous making and testing" of formulations, (Novo Op. Brief at 5), has no merit; the claim language says nothing of the sort. Nor does the list of ingredients provided in the dependent claims rescue Novo's construction; the availability of isotonicity agents other than mannitol for *use in* the previous formulation does not alter the requirement that there *be* a previous formulation—the claims require a preexisting formulation with some isotonicity agent to be replaced by propylene glycol. As such, the court should adopt Teva's construction, in accordance with the claims' plain meaning.

### 3.    Plaintiffs' Reply Position

#### i.    The "Replacing . . . Previously Utilized" Claim Terms Are Not Indefinite

The parties negotiated a Joint Claim Construction Chart over the course of several email exchanges and telephonic meet-and-confers, and not once did Teva raise indefiniteness as a claim construction issue. It certainly did not state in the Joint Claim Construction Chart that it would argue indefiniteness for the "replacing . . . previously utilized" terms. On the contrary,

Teva actually proposed "postpon[ing] consideration of [indefiniteness] until expert discovery." D.I. 39 at 1, n.1. Yet Teva argues in its Answering Brief that the "replacing . . . previously utilized" terms are indefinite. The Court should preclude this belated argument.

Indefiniteness is better reserved for after expert discovery, which has not yet begun. A party seeking to prove indefiniteness must do so by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 101-02 (2011). Attorney argument, which is all Teva presents here, "is generally insufficient to demonstrate invalidity" under that standard. *SunPower Corp. v. PanelClaw, Inc.*, 12-cv-1633-MPT, 2016 U.S. Dist. LEXIS 116949 at *13 (D. Del. Aug. 31, 2016). Parties seeking a finding of indefiniteness during claim construction are, "in effect, asking for summary judgment of indefiniteness" before expert discovery. *Parker-Hannifin Corp. v. Zippertubing (Japan), Ltd*., 06-cv-751-MPT, 2008 U.S. Dist. LEXIS 93548, at *16 (D. Del. Nov. 18, 2008). This Court has previously declined to find indefiniteness at this early stage, referring to it as a "harsh sanction." *Id*. at *17. The Court should take the same approach here.

In any event, the challenged terms are not indefinite. The claims-in-question cover "method[s] for reducing deposits on production equipment [and in the final product] during production of a GLP-1 agonist formulation," and "method[s] for reducing the clogging of injection devices by a GLP-1 agonist formulation," achieved by "replacing the isotonicity agent previously utilized in said formulation with propylene glycol." D.I. 39, Ex. A, '833 patent, claims 23, 26, & 29. Teva argues that the claims lack antecedent basis and are therefore indefinite because "the specification and file history fail to inform those skilled in the art what the 'previously utilized isotonicity agent' is or how it limits 'the scope of the invention.'" *Supra* at 9. Not so. The "previously utilized" isotonicity agent is any isotonicity agent other than

14

propylene glycol, numerous examples of which are provided in the claims (*see* D.I. 39, Ex. A, '833 patent, claims 25, 28, & 31) and the specification (*see, e.g., id*., Example 1 & Tables 1, 2, & 3, at cols.16-17).    The invention is the discovery that using propylene glycol "in said formulation" in lieu of another agent provides important and unexpected benefits, as discussed throughout the specification.  *E.g., id*., col.3, ll.39-48, col.18, ll.56-59.  "[T]he meaning of the claim would reasonably be understood by persons of ordinary skill when read in light of the specification, [and therefore] the claim is not subject to invalidity" for lack of antecedent basis. *E.g., Energizer Holdings v. ITC*, 435 F.3d 1366, 1370 (Fed. Cir. 2006).

Even Teva admits that these terms comprise "unambiguous patent claim language." *Supra* at 11.  That admission should end the indefiniteness inquiry.  Teva also provides a lengthy explanation of what, in its view, "the claim language requires."  *Supra* at 9-10.  Teva's strong views as to what the claims cover contradict its suggestion that their scope is unclear.

Furthermore, antecedent basis may be present by implication.  *Energizer Holdings*, 435 F.3d at 1370-71 (reversing indefiniteness finding because "anode gel" was by implication the antecedent basis for the term-at-issue, "said zinc anode"); *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc*., 424 F.3d 1293, 1319 (Fed. Cir. 2005) (antecedent basis for "said longitudinal axis" was present by implication); *Fisher-Price, Inc. v. Graco Children's Prods*., 154 F. App'x 903, 909 (Fed. Cir. 2005) ("upper seating surface" was by implication the antecedent basis for "seating area").  If antecedent basis for the "replacing the isotonicity agent previously utilized in said formulation" term in claims 23, 26, and 29 were lacking in any way, it is provided by the claims' prior reference to "a GLP-1 agonist formulation," which implicitly contains an isotonicity agent, as do all the formulations discussed in the patent.  For dependent claims 25, 28, and 31, there can be no question as to the terms' meaning, as those claims

15

expressly define the "isotonicity agent to be replaced"—i.e., "the isotonicity agent previously utilized" in the independent claims—by listing several specific isotonicity agents.

Even if these claims did lack antecedent basis—and they do not—a lack of antecedent basis does not necessarily render a claim indefinite. *Energizer Holdings*, 435 F.3d at 1370-1371 (citing MPEP § 2173.05(e) (8th ed. Rev. 2, May, 2004)). Rather, "[i]f the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite," notwithstanding the antecedent basis protocol. MPEP § 2173.05(e) (9th ed. Rev. 02.2017, January, 2008). As explained above, "read in light of the specification," the "replacing . . . previously utilized" terms would inform a person of ordinary skill about the scope of the claims with "reasonable certainty." *See Nautilus, Inc. v. Biosig Instruments, Inc*., 134 S. Ct. 2120, 2124 (2014).

### ii. The Court Should Reject Teva's Proposed Construction and Adopt Novo Nordisk's

Teva argues in the alternative that if the claims are not indefinite, they should be construed to require a "first" formulation with an isotonicity agent to serve as a comparator for a "second" formulation in which the previously used isotonicity agent is replaced with propylene glycol. *Supra* at 11-12. The Court should reject Teva's construction because it ignores the intrinsic evidence, which is the "best source for understanding a technical [claim] term." *Phillips*, 415 F.3d at 1315. The inventors of the '833 patent began with a mannitol formulation and eventually invented a propylene glycol formulation, but it does not follow that a person of ordinary skill would understand these method claims as strictly limited to the change from a "first" to a "second" formulation. The inventors compared and experimented with 14 different isotonicity agents, demonstrating that the choice by a person of ordinary skill to use propylene glycol and the underlying analysis would likely be more nuanced and the timing not so linear.

*See* D.I. 39, Ex. A, '833 patent, col.15, l.61 – col.22, l.21. *See also Phillips,* 415 F.3d at 1315 (quoting *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004) ("In most cases, the best source for discerning the proper context of claim terms is the patent specification wherein the patent applicant describes the invention.")).

For example, a person of ordinary skill might begin with a Formulation A, make a propylene glycol Formulation B, and later select Formulation B.  But he could also make Formulations A and B simultaneously and later select Formulation B.  Alternatively, he could begin with a Formulation B, make a Formulation A, and later select Formulation B.  Each of these scenarios, and many others, are contemplated by the invention and supported by the intrinsic evidence.  Only the first would be covered by Teva's improperly narrow construction, requiring the selection of a "second" over a "first" formulation, ignoring the specification's explanation how propylene glycol was selected above 13 other possible options.

Teva accuses Novo Nordisk of broadening claim scope and omitting the "replacing" limitation in an effort to capture "*any* formulation" that uses propylene glycol. *Supra* at 13.  Not so.  Rather, Novo Nordisk's construction is limited to circumstances in which propylene glycol is utilized "in lieu of another isotonicity agent evaluated for use in" the formulation.  True to the specification, under Novo Nordisk's construction, the other isotonicity agent over which propylene glycol is selected must have been previously evaluated by one practicing the method. It is that previously evaluated agent that is *replaced* by propylene glycol.

Teva argues that the claim language does not permit "simultaneous making and testing" of formulations. *Supra* at 13.  But intrinsic evidence extends beyond the language of the claims themselves, and simultaneous making and testing of formulations is exactly what the Examples teach.  D.I. 39, Ex. A, '833 patent, col.15, l.61 – col.22, l.21.  This activity is not inconsistent

with having a prior or comparator formulation, as Teva attempts to portray it.  Teva rejects this supporting context for Novo Nordisk's construction because it demonstrates that Teva's artificially narrow construction cannot be correct.

### 4.    Defendant's Sur-Reply Position

This Court often entertains challenges to a patent's definiteness at claim construction, it has the discretion to do so, and such a finding is appropriate here.  *See, e.g., TruePosition, Inc. v. Polaris Wireless, Inc.*, No. CV 12-646-RGA-MPT, 2014 WL 490932, at \*12 (D. Del. Feb. 4, 2014) (finding claim indefinite at claim construction); *Hand Held Prods., Inc. v. Amazon.com, Inc.*, No. CV 12-768-RGA-MPT, 2014 WL 2873902, at \*20–23 (D. Del. June 24, 2014) (finding multiple claim terms indefinite at claim construction).  The claims at issue require comparison to, for example, "the formulation containing the previously utilized isotonicity agent."  ('833 patent, claim 24.)  This formulation lacks antecedent basis and as such its composition is insolubly ambiguous, rendering a POSA unable to determine against what the claimed formulation should be compared.  *See In re Packard*, 751 F.3d 1307, 1314 (Fed. Cir. 2014) (holding claim indefinite where "claims have readily observable ambiguities or incoherencies within them" due to lack of antecedent basis).  Novo's protests that the prior formulation is "a GLP-1 agonist formulation" that "implicitly contains an isotonicity agent" are of no moment.  (*Supra* at 15-16.)  Novo's articulation still fails to explain what it means to have a "previously utilized isotonicity agent" in such a GLP-1 formulation "replaced" by propylene glycol.  Moreover, Novo's contorted construction never answers a key question: "previously utilized" by whom?  According to Novo, such agent could have been used by anyone, at any time.  (*See supra* at 16-17.)  Such ambiguity surely renders these claims indefinite.

Indeed, in Novo's construction, "previously utilized" and "replaced" are conveniently read out to resolve this ambiguity, yielding a claim in which any GLP-1 formulation containing

an isotonicity agent that was evaluated by an accused infringer at *any* time serves as "the formulation containing the previously utilized isotonicity agent" that is "replaced" within the meaning of these claims. Instead, Novo would insert terms that do not appear in the claim—"selected from" and "in lieu of." But Novo chose specific, narrow language to describe the two formulations necessary to practice its method claims and it must live with it.

In support of its misguided construction, Novo contends that the specification somehow trumps specific language of the claims to allow a far broader meaning merely because examples in the patent describe testing the properties of multiple isotonicity agents. (*Supra* at 6-8.) This is legally unsound. The start of every claim construction analysis is the language of the claims themselves and the wording of the claims themselves is critical to their construction. *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.'") (quoting 35 U.S.C. § 112, ¶ 2). To be sure, the claims are to be read in light of the specification, but a broader disclosure in the specification cannot overrule otherwise narrower specific claim language. *Gen. Elec. Co. v. Int'l Trade Comm'n*, 685 F.3d 1034, 1041 (Fed. Cir. 2012) ("[A] possibly broader disclosure accompanied by an explicit narrow claim shows the inventor's selection of the narrow claim scope."). Such an approach would improperly read out claim limitations that Novo deliberately included in its claims. *See Tex. Instruments Inc. v. U.S. Int'l Trade Comm'n,* 988 F.2d 1165, 1171 (Fed. Cir. 1993) ("[T]o construe the claims in the manner suggested by [the patentee] would read an express limitation out of the claims. This, we will not do because '[c]ourts can neither broaden nor narrow claims to give the patentee something

different than what he has set forth.'") (quoting *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 396 (Ct. Cl. 1967)).

Teva's construction instead gives meaning to the actual words of the claims, which Novo ignores. The method claim language expressly requires "replacing the previously utilized isotonicity agent," an act that could not occur if no previous formulation that employed an isotonicity agent existed. But according to Novo, if someone 1) made a formulation utilizing propylene glycol, 2) subsequently tested a formulation utilizing another isotonicity agent, and 3) opted to use the previously created propylene glycol-containing formulation, this would still be covered by its method claims that require replacing a previously utilized isotonicity agent with propylene glycol. (*Supra* at 16-18.) But in this scenario, no isotonicity agent is *replaced* by propylene glycol. Similarly, the related dependent claims in the '833 Patent expressly require a comparison between the properties of the claimed formulation to that of the formulation containing the previously utilized isotonicity agent. (*See, e.g.*, '833 Patent, claim 27 ("the reduction in deposits in the final product is measured by a reduction in the number of vials and/or cartridges of the propylene glycol-containing formulation . . . relative to . . . the formulation containing the previously utilized isotonicity agent").) That is, a preexisting formulation that contains an isotonicity agent must exist, such that the "previously utilized" isotonicity agent is *replaced* in the claimed formulation. Without accounting for this requirement, Novo's constructions cannot be correct and must be rejected.

## IV.    DISPUTED CLAIM TERMS OF THE '893 PATENT

### A.    Introductory Remarks

#### 1.    Plaintiffs' Introduction to the '893 Patent

The '893 patent concerns "a push button connection for an injection device." D.I. 39, Ex. B, '893 patent at col.1, ll.17-18. The two principal components of the connection are the push

button and the driver, examples of which are shown in Figure 2 of the patent (with the button in yellow and the driver green):



Fig. 2

When a user pushes the button, the driving part moves forward (away from the push button) and rotates. *Id.* at col.1, ll.46-47; col.3, ll.48-49. This forward movement leads to injection of a dose of the drug.

Prior art push button connections experienced excessive friction between the button and driver when the driver rotated, which required the user to push the button harder to inject a dose. *Id.* at col.1, ll.24-39. Figure 2 of the patent illustrates the respective forces of the user's push and the resultant "vertical" friction (blue circles):

21



Fig. 2

*See* D.I. 39, Ex. B, '893 patent at col.4, ll.23-25 ("When the user applies an injection force A . . . a vertical reaction force B will appear . . . ."). The inventors discovered that they could reduce this frictional force, and consequently reduce the force needed for a user to inject a dose, by adding a pivot bearing between the two parts (the blue box, above). *Id.* at col.1, ll.51-56. As explained during prosecution, "[t]he function of the pivot bearing . . . is to reduce the frictional forces between the push button and the driving part." D.I. 39, Ex. D at NNVICT00008897.

The inventors also discovered a second source of friction: if a user pushed on the periphery of the push button, the push button would tilt, causing more friction and further impeding the proper transfer of force. D.I. 39, Ex. B, '893 patent at col.1, ll.64 – col.2, l.4. These additional "radial" frictional forces are illustrated below (blue circles):



Fig. 2

*See* D.I. 39, Ex. B, '893 patent at col.4, ll.23-28 ("[A]t the same time a radial force C will occur .

. . [and] a radial force D will occur . . . ."). The inventors discovered that using radial bearings

between the button and the driving part (the blue boxes, above) can reduce these frictional

forces, properly transfer force from pushing the button on its periphery, and reduce tilting of the

push button. *Id.*

### 2.    Defendant's Introduction to the '893 Patent

For decades, diabetes patients have been able to self-administer medication to regulate

their insulin levels using pen-shaped injection devices. In order to inject the medication, users

press their finger on a button on the injection device, which transfers mechanical forces

throughout the injection device to ultimately eject medication out of the device and into the

patient's body. The '893 Patent claims an "Injection Button" covering "a push button

connection for an injection device." (D.I. 39, Ex. B, '893 Patent at 1:17-18.) The two main parts

of the injection button are a push button comprising a bore (yellow), which surrounds a driving

part comprising a protrusion (green):



**B.     "Pivot Bearing"**

| Term | Claim | Novo Nordisk's Construction | Teva's Construction |
|------|-------|------------------------------|----------------------|
| "pivot bearing" | 1 | plain meaning, which is "a machine part in which another part turns, where friction along the axis of rotation is reduced at the contacting surfaces of the two parts" | "a conical or spherical surface in contact with another surface to reduce friction between two parts that are subjected to axial thrust and rotation" |

### 1.     Plaintiffs' Opening Position

The prosecution history, a part of the intrinsic evidence, includes a definition of the term "bearing" as "a machine part in which another part turns." *See* D.I. 39, Ex. D at NNVICT00008974.  While the intrinsic evidence does not include a specific definition of *pivot* bearing, the inventors did emphasize during prosecution that its friction-reducing function was essential: "the function of the pivot bearing recited in claim 1 is to reduce frictional forces between the push button and the driving part."  See D.I. 39, Ex. D at NNVICT00008897.  The patent itself also makes this clear: "In order to minimize the friction occurring between the push button and the driving part . . . forces are transmitted via a pivot bearing."  D.I. 39, Ex. B, '893 patent at (57) (Abstract).  Thus, the intrinsic evidence suggests that a "pivot bearing" is "a

machine part in which another part turns, where friction is reduced between the push button and the driving part."

However, that description could apply to both the pivot bearing and the radial bearing, as they both "reduce friction between the push button and the driving part."  Figure 2 illustrates the difference between the two types of bearings by showing the different frictional forces that each reduces: the pivot bearing (the blue box below) reduces the vertical frictional force (Force B) that occurs along the axis of rotation of the driving part (the blue dashed line), as distinguished from the radial bearings, which reduce frictional forces perpendicular to the axis of rotation (radial Forces C & D):



Fig. 2

The patent explains that "a vertical reaction force B will appear" when the user presses the button (Force A), and the invention "minimize[s] this friction . . . [b]y forming a pivot bearing between the two parts."  D.I. 39, Ex. B, '893 patent at col.1, ll.53-56; col.4, ll.23-25. Accordingly, a person of ordinary skill in the art would understand that the "pivot bearing" is "a machine part in which another part turns, where friction *along the axis of rotation* is reduced at the contacting surfaces of the two parts."  This construction is rooted in the intrinsic evidence,

which is "the best source for understanding a technical [claim] term." *Phillips*, 415 F.3d at 1315. It is also consistent with the plain meaning of pivot bearing in the field of mechanical engineering. *See* Ex. E at 1269 ("A pivot journal is shown in Fig. 666 . . . *the direction of pressure is parallel to the axis of the shaft*") (emphasis added).

Teva's proposal of "a conical or spherical surface in contact with another surface" flouts settled patent law by improperly limiting "pivot bearing" to one exemplary embodiment. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346-47 (Fed. Cir. 2015) ("caution[ing] against limiting the claimed invention to preferred embodiments or specific examples in the specification"); *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("[A] patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment"). Figures 1 and 2 of the '893 patent merely illustrate one type of pivot bearing where "the bore [12] is formed with a raised pointer" (*see* D.I. 39, Ex. B, '893 patent at col.3, l.64), but nothing in the intrinsic evidence requires any particular structure or geometry, and therefore the claims are not so-limited. *Phillips*, 415 F.3d at 1323 (explaining that examples should not be construed to limit the claims unless, "upon reading the specification," it is clear that the inventor "intend[ed] for the claims and the embodiments in the specification to be coextensive"). On the contrary, the patent states that the figures are "for illustrative purposes only" and "the invention is not limited to [the preferred embodiments], but may be embodied in other ways." D.I. 39, Ex. B, '893 patent at col.3, l.29; col.4, ll.33-36. Without some clear statement in the specification limiting the claims to the examples, importing a limitation into the claims from an exemplary embodiment in the specification would be to commit a "cardinal sin" of patent law. *Phillips*, 415 F.3d at 1319-20 (importing a limitation from the specification into

the claims is "'one of the cardinal sins of patent law'") (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)).

Furthermore, extrinsic evidence confirms that the term "pivot bearing" includes various geometric shapes, not just the "conical" or "spherical" bearings of Teva's construction:



| Flat Pivot Bearing (Ex. A, Fig. 8-21) | Flat-Ended Pivot Bearing (Ex. B, Fig. 1) | Conical Pivot Bearing (Ex. B, Fig. 2) | Spherical Pivot Bearing (Ex. B, Fig. 6) | Pivot Journal Bearing (Ex. E, Fig. 666) |
|---|---|---|---|---|

| Collar Pivot Bearing (Ex. A, Fig. 8-21) | Conical Pivot Bearing (Ex. C, Fig. 2) | Three Types of Pivot Jewel Bearings (Ex. D, Fig. 1) | | |
|---|---|---|---|---|

Thus, even apart from the guidance of the intrinsic evidence, a person of ordinary skill in the art would recognize that pivot bearings take many forms and are not limited to the two specific shapes that Teva proposes.

## 2.     Defendant's Answering Position

The parties agree that a pivot bearing is used to reduce rotational friction between parts, however, this is simply an inherent property of a "pivot bearing" in mechanical engineering.

Novo's proposed construction fails to acknowledge any structural limitations of this element set forth in the '893 Patent. Novo also effectively ignores the limitation "pivot".

A POSA would understand that a "pivot bearing" is not a "machine part" but rather creates a bearing surface "area of contact" between parts such as the end of a shaft and a second part to allow rotation and reduce friction. (Ex. B.) Novo's proposal is confusing and incorrect. As detailed throughout the '893 Patent's written description, the purpose of the pivot bearing is to "bear[] on a surface of the [driving part] protrusion" and thus reduce friction at the "surface area of interaction" between the push button-bore and driving part-protrusion. ('893 Patent, 2:30-31; 1:53-56.) Thus, the specification supports Teva's proposed construction of a "surface in contact." *Phillips,* 415 F.3d at 1315.

The '893 Patent teaches that the pivot bearing serves to ensure that the "surface area of interaction between [the push button-bore and driving part-protrusion is] *minimized* and the radius of the resulting friction force can be kept at a *minimum*." '893 Patent, 1:53-56. Novo, ignoring its specification, and relying on extrinsic evidence argues that the pivot bearing in the '893 Patent may be formed in a range of geometries, (Ex. D), and "may be flat on the end or slightly cup shaped," ranging from flat-ended, to spherical, to conical. (Exs. A, E.) Again, this is contradicted by the more probative intrinsic evidence, because a <u>flat</u> bearing surface would actually *maximize* the surface of interaction and could be further *minimized* by creating a curved or pointed bearing at the surface of interaction. Therefore, a POSA would understand that the pivot bearing in the '893 Patent could not be a flat bearing and must either be curved (*i.e.* spherical) or pointed (*i.e.* conical), as Teva's proposed construction provides. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("The patentee may demonstrate an intent to deviate from the ordinary and accustomed meaning of a claim term by including in the

specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.")

Novo's construction is also literally incorrect and confusing. A "part in which another part turns" implies that some other part inserts into the pivot bearing, wherein that other part then turns. This describes neither the point-to-point surface of interaction disclosed in the '893 Patent, nor the ordinary "bearing surface" definition of a pivot bearing. The fact that Novo cited this definition during prosecution is inapposite. *Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364, 1367-68 (Fed. Cir. 2003) (recognizing that the intrinsic record "trump[s] an inconsistent dictionary definition"). Novo's chosen definition is actually that for "bearing," not a "pivot bearing"—a distinction which Novo has itself repeatedly recognized. (D.I. 39, Ex. D, '893 Patent File History, Jan. 16, 2014 Reply Brief at 3-5 (NNVICT00008974-76) (admonishing the Examiner for "completely ignor[ing] the term 'pivot' in 'pivot bearing'") In fact, this definition is the *second* mechanical definition for "bearing" in Novo's source, offered after the first definition of "an object, *surface*, or *point* that supports," a primary definition which bolsters Teva's proposed construction. (Ex. K, Merriam-Webster.)[8]

Novo attempts to cast aside Teva's narrower definition of pivot bearing as limiting to one exemplary embodiment. Novo is incorrect. First, Teva's proposed construction for "pivot bearing" includes a "conical *or* spherical" surface. The only embodiment disclosed in the '893 Patent contains a spherical pivot bearing. (*See* '893 Patent, Figure 1.) Teva's proposed

---

[8] http://www.merriam-webster.com/dictionary/bearing, cited by Applicants in Jan. 16, 2014 Reply Brief (D.I. 39, Ex. D at NNVICT00008974). The page as published on Jan. 16, 2014 was accessed on March 15, 2018 via the "Wayback Machine" at http://web.archive.org/web/20140116063634/www.merriam-webster.com/dictionary/bearing. The Wayback Machine is a non-profit Internet Archive that stores digital copies of internet websites dating back to 1996 and is a member of the American Library Association. (*See* https://archive.org/about/)

construction thus accounts for a range of shapes in addition to the spherical embodiment by including a "conical" surface of contact.  As Novo acknowledges through its extrinsic evidence, Teva's proposed construction would in fact cover most of the non-flat ended pivot bearing designs.  Second, Novo's proposed construction fails to provide any limitation regarding the structure of the pivot bearing itself, instead only reciting the function of the pivot bearing. Because a "pivot bearing" is a general term in mechanical engineering and may exist in a number of geometries, the structure of the only embodiment disclosed in the specification may appropriately be used to identify a definite structure for the term, lest it be indefinite.  *See Lizardtech, Inc. v. Earth Res. Mapping, Inc.,* 433 F.3d 1373, 1375 (Fed. Cir. 2006) ("Claims are not necessarily limited to preferred embodiments, but, if there are no other embodiments, and no other disclosure, then they may be so limited.").

### 3.    Plaintiffs' Reply Position

#### i.    Teva Improperly Disregards Intrinsic Evidence

Teva criticizes Novo Nordisk's construction of "pivot bearing" for incorporating the phrase a "part in which another part turns," claiming that it is "inapposite" that "Novo cited this definition [incorporating this language] during prosecution."  *Supra* at 28-29.  Teva is wrong. Because this dictionary definition was cited to the Examiner during prosecution it becomes intrinsic evidence.  *See Kumar*, 351 F.3d at 1368 ("[P]rior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence" for purposes of claim construction.).  Far from "inapposite," this intrinsic evidence is the clearest indication of what the applicants understood pivot bearing to mean.  *See Phillips*, 415 F.3d at 1315.

Teva claims that its own construction is "bolster[ed]" by the cited dictionary's alternate, un-cited definition of "bearing" as "an object, surface, or point that supports."  *See supra* at 29. A person of ordinary skill would understand that the applicants chose to cite to the Examiner the

"part in which another part turns" definition over the alternate definition because it more closely captured what was intended by "pivot bearing" in the patent. On the contrary, this alternate definition offers innumerable options for the shape of a bearing; it certainly does not restrict the shape to conical or spherical, as Teva's construction would. Teva's disregard for what the applicants cited in favor of what they did not cite is illogical and unhelpful.

### ii. Teva's "Conical or Spherical" Structural Limitation Is Incorrect

Teva mistakenly argues that Novo Nordisk ignores the "pivot" limitation of "pivot bearing" and "fails to acknowledge any structural limitations" of the term. *Supra* at 27. First, there is no requirement that the term claim structure as opposed to function. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1366 (Fed. Cir. 2017) ("[W]e have long held that nothing in the law precludes . . . defining a particular claim term by its function." (internal quotations omitted)). Moreover, Novo Nordisk's construction does incorporate structure by the language: "contacting surfaces of the two parts." In fact, both parties' constructions incorporate this idea in a similar manner ("contacting surfaces" v. "surface in contact"). Thus, if the specification supports Teva in this regard, as Teva argues, it also supports Novo Nordisk's construction. In addition to the "contacting surfaces" structural limitation, the claims themselves provide whatever structural limitations may be necessary. *See, e.g.*, D.I. 39, Ex. B, '893 patent, claim 1 ("pivot bearing is formed between the bottom surface [of the bore] and the top surface [of the protrusion]"). Adding more structural limitations to the construction of "pivot bearing" would therefore be redundant.

The additional "structural limitation" that Teva proposes is a "conical or spherical" contacting surface. But the intrinsic evidence does not support this litigation-induced limitation, and the Court should reject it. Teva attempts to fabricate support by arguing that the

specification requires the surface area of interaction to be "minimized," implying that a cone or sphere is the only way to do so. *Supra* at 28. First, the specification does *not* require minimization, but rather indicates that "minimiz[ing] this friction" was but "*one way* of minimizing the force a user must apply in order to perform an injection." D.I. 39, Ex. B, '893 patent, col.1, ll.51-53 (emphasis added). Second, even if the surface area of interaction must be minimized – and it need not be – minimization is not necessarily achieved only by a conical or spherical surface. Teva offers no support for its unfounded claim that a "flat bearing surface would actually maximize the surface of interaction." *Supra* at 28. Nor could it. A person of ordinary skill could easily appreciate that a very small, but flat surface would have less surface area of interaction than a broader conical or spherical surface.

Teva cites *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313 (Fed. Cir. 2002) in support of its construction. *Supra* at 28. But *Teleflex* does not support Teva. In *Teleflex*, the Federal Circuit reversed the district court's claim construction for improperly importing a limitation where the specification disclosed only one embodiment but "no 'clear statement of scope' limit[ing] the term." 299 F.3d at 1327-28. Likewise, the specification of the '893 patent does not include "expressions of manifest exclusion or restriction" carving out flat surfaces from the "ordinary and accustomed meaning" of pivot bearing. *Id.* at 1325.

### iii.    Teva Cannot Justify Limiting Its Proposed Construction to a Single Embodiment

As explained in Novo Nordisk's Opening Brief, Teva's proposed construction is improperly limited to an "exemplary embodiment." *See Williamson*, 792 F.3d at 1346-47. Teva argues this is not so because its construction allows for "conical or spherical" surfaces, while the only embodiment in the patent is spherical. *Supra* at 29. But the intrinsic evidence does not support limiting the surface of interaction to either shape. And as Teva admits, a pivot bearing

"may exist in a number of geometries." *Id.* Moreover, Teva's construction inconsistently allows the surface to be one shape that, according to Teva, finds no support in the specification (conical), but not others (i.e., flat), suggesting that it is the result of clear cherry-picking, presumably in support of a non-infringement argument. In construing "pivot bearing" to allow conical surfaces, Teva disregards its own interpretation of *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 433 F.3d 1373 (Fed. Cir. 2006), which it cites to argue that the construction of "pivot bearing" should be limited to the only embodiment disclosed in the specification, lest it be indefinite. *LizardTech* is a short order, with a longer dissent, declining to rehear, *en banc*, a decision on written description. Even if the Court were to agree with Teva's reading of *LizardTech,* the case does not support Teva's proposed construction, which is, according to Teva, not limited to the preferred embodiment.

The District of Delaware has repeatedly cited *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005), a case reaching the opposite conclusion, and discussed extensively in Judge Rader's *LizardTech* dissent. Specifically, "[i]t is improper to 'import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or even describes only a single embodiment, unless the specification makes clear that the patentee . . . intends for the claims and the embodiments in the specification to be strictly coextensive.'" *Invenas Corp. v. Renesas Elecs. Corp.*, 11-cv-448-GMS, 2013 U.S. Dist. LEXIS 101074, at *25-26 (D. Del. July 15, 2013) (quoting *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005) (internal quotations omitted)). Importing limitations from the specification is a long-standing "cardinal sin" of the patent law. *Phillips*, 415 F.3d at 1319-20. Here, a person of ordinary skill would have no reason to believe the patentee intended

the claims and embodiment in the specification to be strictly coextensive. Teva surely identifies no such reason. Accordingly, it would be improper to import limitations from a preferred embodiment in the specification to the claims. Teva's attempts to do so should be rejected.

### 4.    Defendant's Sur-Reply Position

Teva's proposed constructions for the '893 Patent are the only constructions that satisfy what the specification described as the invention, not what Novo argues to be just a single embodiment.

Teva's proposed construction covers both a "conical *or* spherical surface," *i.e., two* broad geometrical categories, undermining out of the gate Novo's argument that Teva is limiting its construction to a *single* embodiment. (*Supra* at 26, 32). Next, Novo avoids that the term being construed is "pivot bearing," and as the specification teaches the invention is to "minimize" the surface area between two parts (the push button and the driving part) in order to "minimize" the friction between these two parts and minimize the force a user must apply to drive an injection. ('893 Patent col. 1, l.46-56). The specification makes clear that "[b]y forming a pivot bearing between the two parts, the surface area of interaction between the two objects can be minimized and the radius of the resulting friction force can be kept at a minimum." ('893 Patent col 1, ll.53-56). In other words, a POSA would see that the push button must pivot (or in the inventors' words "tilt" (*id.* at col 2, l.3)) on the smallest possible surface contact with the driver part to minimize this friction. The object of this invention can only be achieved by a conical or curved bearing surface. The sole embodiment of the pivot bearing in the '893 Patent is a "raised pointer," as this is a physical necessity to minimize the pivot bearing's surface area of interaction between the push button and the driving part. (*Id.* at col. 3, ll.61-64). When only a single embodiment is described in the specification, "the claims [may be] correctly interpreted as limited thereto." *Wang Labs., Inc. v. Am. Online, Inc.,* 197 F.3d 1377, 1383 (Fed. Cir. 1999).

The specification teaches that it is an "object of the present invention" to form a pivot bearing in a shape that minimizes the surface area of contact between the two parts. ('893 Patent, col. 1, ll.43-45). The flat-on-flat surface connection that Novo argues for cannot meet the goal of the invention as described in the specification.

Novo again rearranges the text of the '893 Patent to shoehorn into its own arguments, this time to belittle the importance of minimizing the surface area of the pivot bearing. (*Supra* at 31). Though minimizing friction is argued to be just one way to reduce the force a user must apply to perform an injection, given that the inventors selected that "[o]ne way," the inventor's explicitly chose to do this by providing a pivot bearing that would minimize "the surface area of interaction between the two objects." ('893 Patent, col. 1, ll.50-56). Minimizing the surface area of interaction at the pivot bearing necessarily excludes a flat-ended bearing from the definition of "pivot bearing." *See Watts v. XL Sys., Inc.,* 232 F.3d 877, 883 (Fed. Cir. 2000) (limiting claim term because specification limited invention to structures utilizing certain features). Therefore, Teva's proposed construction does not improperly limit the term to a preferred embodiment, but rather properly limits the term to only those structures capable of achieving an object of the invention. *Id.; see also Wang Labs.,*197 F.3d 1383 (holding when only a single embodiment is described in the specification, "the claims were correctly interpreted as limited thereto"); *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1551 (Fed. Cir. 1996), *reinstated by*, and *abrogated on other grounds by Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558 (Fed. Cir. 2000) ("[W]hen the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment.").

Furthermore, though Novo alleges that Teva improperly limits the term "pivot bearing" to a preferred embodiment, Novo itself distinguished the term "pivot bearing" from prior art on the basis of this spherical embodiment.  Claim 1 of the '893 Patent was originally rejected as anticipated by U.S. Patent No. 5,383,166 ("Gallay"), because the Examiner concluded that Gallay disclosed a pivot bearing formed between the bottom surface of a push button and the top surface of a driving part:



('893 Patent File History, July 25, 2013 Appeal Brief at 10, 14 (NNVICTO00008892, 896)).

In order to overcome this rejection, Novo pointed to the embodiment disclosed in Figure 1 of the '893 Patent where "the bottom surface **17** of the bore **12** is formed with a raised pointer forming a pivot **18**" and circled this raised, spherical pivot bearing:



36

(*Id.* at 12 (NNVICTO00008894) (emphasis in original))  Novo distinguished the '893 Patent

from prior art on the basis of this particular spherical "raised pointer" pivot bearing embodiment.

Novo's criticisms are misplaced and the Court should grant Teva's proposed construction.

### C.    "Radial Bearing"

| Term | Claims | Novo Nordisk's Construction | Teva's Construction |
|------|--------|------------------------------|----------------------|
| "radial bearing" | 2, 3, 4 | plain meaning, which is "a machine part in which another part turns, where friction perpendicular to the axis of rotation is reduced at the contacting surfaces of the two parts" | "cylindrical raised area of contact to reduce friction between a shaft and bore that rotate relative to each other" |

### 1.    Plaintiffs' Opening Position

As explained above, the invention's "radial bearings" (shown in blue boxes below)

address frictional forces C and D, which are perpendicular to the axis of rotation of the driving

part (the dashed blue line below), as illustrated in Figure 2 of the '893 patent:



The '893 patent explains that "[w]hen the user applies an injection Force A at the peripheral area

of the push button . . . a radial force C will occur at the upper radial bearing" and "a radial force

D will occur at the lower radial bearing," both of which are perpendicular to the axis of rotation. *Id.* at col.4, ll.23-29. The radial bearings "hav[e] the least possible radius of friction" and thus ensure that "forces applied at . . . the periphery . . . of the push button [i.e., Force A above] . . . [are] properly transferred" to the driving part. *Id.* at col.1, ll.62-67. Novo Nordisk's proposed construction flows from this intrinsic evidence: "a machine part in which another part turns, where friction *perpendicular to the axis of rotation* is reduced at the contacting surfaces of the two parts." It is also consistent with the plain meaning of "radial bearing" in the art as understood by a person of ordinary skill. *See* Ex. E at 1269 (for "an ordinary journal," "the direction of pressure is . . . perpendicular to [the axis]*"*) (emphasis added); Ex. F at 3 (identifying "journal" bearing as a type of "radial" bearing where "radial load component is in the direction normal [i.e., perpendicular] to the shaft axis").

Teva's construction of "radial bearing" requires "a cylindrical raised area of contact." But nothing in the claims or anywhere else in the intrinsic evidence requires this specific feature. Presumably Teva's proposal flows from an embodiment described in the specification, which describes one of the radial bearings depicted in Figure 1 as "a belt [25] with a slightly raised diameter." D.I. 39, Ex. B, '893 patent at col.4, ll. 4-5. As with "pivot bearing," the Court should reject Teva's attempt to limit "radial bearing" to an exemplary embodiment. *Kara Tech.*, 582 F.3d at 1348. In fact, the patent itself indicates that a radial bearing need not take that form, as the other radial bearing depicted in the Figure—seen in Figure 2 at the end of the Force C arrow—does *not* have a "raised area." Teva's construction of "radial bearing" therefore excludes a preferred embodiment, an approach that is "rarely, if ever, correct." *Pfizer Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1374 (Fed. Cir. 2005) (quoting *SanDisk Corp.*, 415 F.3d at 1285).

Furthermore, extrinsic evidence confirms that persons of ordinary skill understand the term "radial bearing" to include bearings formed without a "raised area."  *See e.g.,* Ex. F at Fig. 7-1 (illustrating a radial bearing with a constant radius).  Thus, extrinsic evidence supports the conclusion, rooted in the intrinsic evidence, that Teva's proposal is incorrect.

### 2. Defendant's Answering Position

As with "pivot bearing," the parties agree that "radial bearing" in the '893 Patent functions in part to reduce friction between two parts.  However, a "radial bearing" is a term of art in mechanical engineering that merely refers again to a surface (not a "machine part") bearing a radial load and may exist in a variety of structural configurations "classified according to their geometry," which can include journal bearings, spherical bearings, conical roller bearings, etc. (*See, e.g.,* Ex. E.)  Despite the variety of structural possibilities for a radial bearing, nowhere in the claims of the '893 Patent is the structure of its "radial bearing" described.  The only description of radial bearing in the '893 Patent appears in the specification and merely describes its function "to secure the fit between the push button and the driving part" and "direct forces applied on the periphery of the push button to the driving part."  ('893 Patent, 1:57-61.) Accordingly, "radial bearing" must be read in view of the specification and embodiments to identify the structural bounds of this limitation and distinguish it from prior art.

The radial bearings claimed in the '893 Patent are formed between the push button and the driving part. ('893 Patent, claim 2.)   Claim 2 depends on independent Claim 1, which discloses that the push button interacts with the driving part vis-à-vis the push button-bore surrounding the driving part-protrusion.  The radial bearings are provided "between the push button and the driving part," and there is just one disclosure of this structure in the '893 Patent. (*Id.*)  The push button bore is a "cylindrical bore with a circular cross section," and the "most proximal part of the bore has a smaller diameter than the remaining part of the bore."  ('893

Patent, 3:52-60.)  In order to mate with this bore, the driving part has a "protrusion having a circular cross section" with "a top part with a decreased diameter compared to the remaining part of the protrusion." ('893 patent, 3:65-4:2.)  As can be seen in Figure 1, it is where these changes in diameter occur between the cylindrical bore and protrusion that form a tighter fit of the bore around the protrusion and create a radial bearing:



In other words, and as Teva's proposed construction describes, the radial bearings exist where the surface of the cylindrical bore is raised, *i.e.* indented in, to contact the cylindrical protrusion inserted within.  As can be seen at radial bearing Points C and D above, the bore cylinder is clearly raised as compared to the lower sections of the bore.  Accordingly, Teva's proposed construction defining a "cylindrical raised area of contact" is consistent with how a POSA would understand "radial bearing" in the '893 Patent.

Novo again accuses Teva of improperly limiting this term to a preferred embodiment, however yet again Novo's claims do not provide any sufficiently definite structure of "radial bearing" and its own proposed construction merely recites functional language.  A POSA must identify the boundaries of "radial bearing" from the specification of the '893 Patent. *Lizardtech*, 433 F.3d 1373, 1375.  The specification teaches radial bearings formed by raised cylindrical areas, as Teva's construction describes.  Novo confusingly and wrongly attempts to justify its

broadening of "radial bearing" by accusing Teva's construction of simultaneously limiting a term to a preferred embodiment and excluding a preferred embodiment. (*Supra* at 38.)

Novo's proposition that the radial bearing depicted at the Force C arrow is not a "cylindrical raised area" is likewise incorrect. Looking at the images below, it is clear that the "radial bearing" provided by the bore cylinder at Force C (depicted by the blue line) is raised from the rest of the bore cylinder (depicted by the red line) in the direction of the blue arrow. Though it may be difficult to visualize as "raised" looking at a vertical cross-section, rotating this image counter-clockwise in the image on the right below illustrates that the inner surface of the cylinder at Force C is clearly "raised." And though this may not look like a cylinder in these images, one must keep in mind that this is a cross-sectional image of a cylindrical bore and the raised area continues 360° around to form a cylinder.



For these reasons, Novo's proposed construction should be rejected.

### 3. Plaintiffs' Reply Position

Radial bearings are present in two places in the figures of the '893 patent (i.e., shown by arrows C and D of Figure 2).



Fig. 2

The specification teaches that a "radial top bearing" is present at the "proximal" end of the protrusion, and a "radial bottom bearing" is present at the "distal" end of the protrusion. It further teaches that the protrusion has a "decreased diameter" at the radial top bearing, and the protrusion has a "slightly raised diameter" at the radial bottom bearing. *See, e.g.*:

This protrusion **21** has at its <u>proximal end</u> a top part **23** with a <u>decreased diameter</u> compared to the remaining part **26** of the protrusion **21**. Further the protrusion **21** is provided with a radial extending rim **24** at its <u>distal end</u>. In the area around this rim **24**, the protrusion **21** is provided with a belt **25** with a <u>slightly raised diameter</u> . . . Further the push button **10** is radially supported by the protrusion **21** at the top part **23** forming a <u>radial top bearing</u> **23, 13**. The belt **25** on the protrusion **21** bears on an area of the remaining part **14** of the bore **12** thus forming a <u>radial bottom bearing</u> **14, 25**.



Fig. 1

D.I. 39, Ex. B, '893 patent, col.3, l.65 – col.4, l.5; col.4, ll.15-19 (emphasis added); Fig. 1.

Teva's proposed construction of "radial bearing" including a "cylindrical raised area of contact to reduce friction between a shaft and bore" is contradicted by the clear teachings of the patent. The patent specification explains that the protrusion has a "slightly raised diameter" at its distal end (i.e., at arrow D). D.I. 39, Ex. B, '893 patent, col.4, ll.3-5. In other words, the *protrusion rises* to meet the bore at arrow D through a "belt," which forms a radial bottom bearing. At the proximal end of the protrusion (i.e., at arrow C) there is *no* "raised area of contact" on the protrusion. In fact, the protrusion is actually set back at arrow C. The bore is fitted to this setback. *See* Figure 2. The "cylindrical raised area of contact" to which Teva's construction refers, cannot therefore, refer to a raised area on the protrusion.

In response, Teva argues that it is "the bore cylinder" that is "clearly raised as compared to the lower sections of the bore" at both arrows C and D. *Supra* at 40. Teva's position is therefore that the *bore rises* to meet the protrusion to form the radial bearings. That understanding is at odds with the specification, and cannot be correct. *Renishaw PLC*, 158 F.3d at 1250. In a creative attempt to make sense of its improper construction, Teva turns Figure 2 counter-clockwise to argue that the bore is "raised" at the proximal end of the protrusion (i.e., at arrow C). *Supra* at 41. Notably, Teva does not include the distal end of the protrusion (i.e., at arrow D) in this counter-clockwise image. If it had, it would be readily apparent that the bore at arrow D is not "raised," as Teva argues, to form a radial bottom bearing, as would be required by Teva's construction. At best, the bore could be considered "raised" at the radial top bearing (but only under Teva's convoluted explanation) – but certainly not at both radial bearings. Moreover, as the specification clearly indicates, it is not a raised bore that forms either radial bearing, despite Teva's characterization. D.I. 39, Ex. B, '893 patent, col.3, l.65 – col.4, l.5. Teva's construction is at odds with how a person of ordinary skill would understand the invention, and

indeed at odds with the inventors' understanding of their own invention. As described in the specification, the protrusion has a "slightly raised diameter" because it is "provided with a belt" at its distal end (i.e., at arrow D). *Id.* at col.4, ll.2-5. Nowhere is the bore described as being "raised," as Teva argues. The Court should reject Teva's confusing and inaccurate construction of "radial bearing" and adopt Novo Nordisk's plain meaning construction, which is supported by the intrinsic evidence.

### 4.    Defendant's Sur-Reply Position

Teva's proposed constructions for the '893 Patent are the only constructions that satisfy what the specification described as the invention, not what Novo argues to be just a single embodiment.

Again, the patent specification makes clear that a "bearing" is the surface contact area between two parts. ('893 Patent col. 1, ll.62-63 ("one radial bearing is formed…and one is formed in the lower area")). Novo's criticisms that Teva's construction for "radial bearing" improperly limits to an embodiment fail for the same reasons as those described above for "pivot bearing." Additionally, this criticism completely disregards the sole structure described in the specification and depicted in the patent drawings. Although the drawings are in two dimensions, even Novo concedes that the driving part and the push button are cylindrical parts, and no other structure is advanced for this element of the invention. *See Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1300-01 (Fed. Cir. 1999) (limiting structure to that disclosed in the specification and drawings where claim itself "do[es] not shed dispositive light" on the structure and nowhere in the specification or drawings is any other structure shown). Thus, Teva's construction, "cylindrical raised area of contact to reduce friction between a shaft and bore that rotate relative to each other" is accurate. Novo's only real point of contention is with the word "raised". (*Supra* at 43). But in making this argument Novo turns the clear drawing on its ear.

Novo concedes that the lower radial bearing location (D below) has a belt raised protrusion (circled in red). (*Supra* at 43) ("the *protrusion rises* to meet the bore") (emphasis in original). Then it argues that the bearing formed at location C is not a raised but a recessed area. Novo is wrong, as a POSA or indeed anyone can see, even the upper radial bearing is formed from a raised part (circled in blue). Thus, Teva's construction is correct and Novo is wrong.



Confused by its own argument, after first conceding that "the protrusion rises to meet the bore," (*Supra* at 43), later in its Reply brief Novo also concedes that "the bore could be considered 'raised' at the radial top bearing." (*Id.*).

The claim language describes the radial bearing as being "provided" between the bore and the protrusion. ('893 Patent col. 1,ll.57-61; claim 2). This structure is confirmed by additional details in the specification that describe the radial bearings as providing radial support "[i]n order to secure the fit" between the bore and protrusion. (*Id.* at col. 1, ll.57-61).[9] The specification describes the push button-bore as "cylindrical" and the driving part-protrusion as

---

[9] Novo argues that with Teva's construction, these radial bearings would not be necessary if the "driving part" only transferred an "axial force," however Novo mischaracterizes Teva's point. It is precisely *because* there are radial bearings that "forces applied on the periphery of the push button [are directed] to the driving part." ('893 Patent, col. 1, ll.57-61). Thus, radial forces at radial bearings C and D in Figure 2 neutralize each other, leaving only an axial, *i.e.* "vertical reaction force B" for the driving part to transfer. (*Id.* at col. 4, ll.23-26).

having a "circular cross section" as well.  (*Id.* at col. 2, ll.9-14; col. 3, ll.52-66, Figures 1-2)  The radial bearing provided to secure the fit between these two cylindrical parts is likewise described by the "radius of the bearings" and as having a "diameter," *i.e.* it too is cylindrical.  (col. 2, ll.9-14; col. 4, ll.17-19). "No other structure is illustrated or described."  *See Toro Co.*, 199 F.3d at 1301 (construing a term as limited to the preferred embodiment where it "is not simply the preferred embodiment; it is the only embodiment"); *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1581 (Fed. Cir. 1997) (finding that a POSA would read the claims and written description to be limited to the only structure contemplated by the written description).

Accordingly, both parties are in agreement that both the top and lower radial bearings may be described as a "cylindrical raised area"—whether the raised area be on the bore or protrusion.  The Court should therefore grant Teva's construction.

**D.    "Driving Part"**

| Term | Claims | Novo Nordisk's Construction | Teva's Construction |
|------|--------|----------------------------|---------------------|
| "driving part" | 1, 2, 5 | plain meaning, which is "a part that transfers force from the push button" | "component with a protrusion that inserts into the push button that is used to transfer axial force from the push button to the injector" |

**1.    Plaintiffs' Opening Position**

The parties agree that a driving part is a part or component that transfers force from the push button, as seen in the proposed constructions above.  The specification confirms this is the function of the "driving part."  *See* D.I. 39, Ex. B, '893 patent at col.1, ll.46-48 ("When a user pushes on the injection button, the force applied is directed to the forward movement of the driving part"); col.3, ll.37-39 ("When a user wants to inject a dose . . . the user pushes the push button 10 which then moves the driving part 20"); claim 1 ("when a user presses on the push

46

button the force is directed toward the driving part"). Novo Nordisk's construction is consistent with these disclosures: "a part that transfers force from the push button." The specification does not contain any narrower definition or limitation.

Teva argues the construction for "driving part" must also include "protrusion that inserts into the push button that is used to transfer axial force . . . to the injector." This construction is incorrect for at least three reasons.

First, substituting Teva's proposed "component with a protrusion . . ." language into claim 1 leads to a redundant and confusing result: "which bore surrounds a protrusion on the [component with a protrusion . . .]." *See Novartis Pharms. Corp. v. Actavis, Inc*., No. 12-366-RGA-CJB, 2013 U.S. Dist. LEXIS 165317, at *14-15 (D. Del. Nov. 21, 2013) (rejecting construction that "would render other portions of the claim redundant and inject confusion, rather than clarity, into the understanding of this term's meaning"); *W.L. Gore & Assocs. v. C.R. Bard Inc.,* No. 11-515-LPS, 2014 U.S. Dist. LEXIS 110140, at *33-34 (D. Del. Aug. 8, 2014) (rejecting construction of "covering" that rendered other portions of the claim language redundant).

Second, the specification makes clear that the force transferred by the driving part is not limited to "*axial* force" as proposed by Teva. Indeed, the '893 patent also discloses transferring a force applied at the periphery of the push button. D.I. 39, Ex. B, '893 patent at col.2, ll.1-3 ("If a user applies a force eccentric to the centre axis of the push button i.e., on a peripheral area of the push button, the push button will tilt."); col.1, ll.64-67 ("In this way forces applied at in the periphery area of the push button and causing titling of the push button on the protrusion of the driving part is properly transferred."). Teva's construction contradicts the specification and

47

should be rejected. *Vitronics*, 90 F.3d at 1582 (The specification is "[u]sually . . . dispositive; it is the single best guide to the meaning of a disputed term.").

Finally, the requirement that the driver transfer force "to the injector" is unsupported by the specification and claims, neither of which mention an "injector" or a similar component. Teva cannot add extraneous limitations that have no support in the record. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325 (Fed. Cir. 2003), *rev'd on other grounds*, ("It is improper for a court to add extraneous limitations to a claim, that is limitations added wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.") (*quoting Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993)).

## 2.    Defendant's Answering Position

The term "driving part" appears in independent claim 1, upon which each asserted claim depends. The parties agree that the driving part performs the function of transferring force from the push button. (*Supra* at 46.)  However, considering only the function of this element, as Novo seeks to do, entirely disregards the specific and narrowly defined structure of the driving part as it is claimed in the '893 Patent. ('893 Patent, claim 1.)  The driving part has a "protrusion." (*Id.* at claim 1.)  The "protrusion of the driving part" is fundamental to nearly every element of the '893 Patent: this protrusion inserts into and is surrounded by a bore in the push button (*Id.* at claim 1; 2:27-30); the "protrusion has a top surface" wherein a pivot bearing is formed (*Id.* at claim 1; 2:30-31); radial bearings are provided against this driving part-protrusion (*Id.* at claims 3-4; 2:57- 67); and a rim is provided on the driving-part protrusion to allow for a snap on connection between the push button and driving part. (*Id.* at Claim 6; 2:15-22.)  Accordingly, a POSA would understand the "driving part" to be designed as a "component with a protrusion that inserts into the push button," as Teva proposes. *See Phillips*, 415 F.3d at 1315; *SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001) (if a given

structure is characterized as part of the "invention[, this] is strong evidence that the claims should not be read to encompass the opposite structure").

The patent specification likewise confirms Teva's construction regarding the driving part's role in transferring axial force from the push button. To initiate an injection, the "user *pushes* the push button," which "is *unable to rotate* due to the friction between the users finger and the push button." ('893 patent, 3:37-51.) This pushing "moves the driving part *axially forward* in the injection device." (*Id.* at 3:37-39.) Therefore, a POSA would understand that the only force the push button experiences is an *axial* force pushing down on the push button, which transfers to the driving part causing it to move "axially forward."

Novo's proposed construction purporting to claim the plain and ordinary meaning of the term seeks to avoid the specific structure and function disclosed as the "driving part" in the '893 Patent in order to broaden the term's meaning beyond the claims and specification. Novo's statement that "[t]he specification does not contain any narrower definition or limitation" than a mere "part that transfers force from the push button" is incorrect. This construction would define the driving part as a part that transfers *any* force from the push button, such as rotational force, and not limited to axial force. This construction would contradict both the claim language and specification because the push button "is unable to rotate." With no rotational motion, the push button has no rotational force to transfer. ('893 Patent, claim 1; 3:46-51.) Novo's proposed construction is thus at odds with the claims and specification and should be rejected. *Phillips*, 415 F.3d at 1316 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.")

Novo attempts to argue that limiting the force transferred by the driving part to axial force would not account for an off-center force applied at the periphery of the push button. But

this conflates the role of the force applied by a user and the resulting force that the push button transfers to the driving part.  A construction based on this misconception is at odds with a POSA's understanding, as well as with the specification, and should not be considered.  *Phillips,* 415 F.3d at 1315.  The push button in this patent is mounted on the driving part-protrusion and secured in the radial direction by radial bearings to ensure that regardless of where a force is applied to the push button, even at the outermost edges, the resulting force transferred to the driving part will be a downward axial force to "move[] the driving part axially forward and will not cause the push button to tilt."  ('893 Patent, 1:64-67; 3:37-39.)  This resulting vertical axial force is confirmed by the "vertical [upward] reaction force B":



Therefore, even when an off-center force is applied to the push button, the only force that the driving part transfers from the push button is an axial force.  ('893 patent, 4:23-24.)

### 3.    Plaintiffs' Reply Position

Teva faults Novo Nordisk for not incorporating "protrusion" into the construction of "driving part," but Teva's incorporation of protrusion cannot be correct.  As Teva acknowledges, claim 1 independently requires that there be a "protrusion on" the driving part.  *Supra* at 48.  It would be redundant and improper to incorporate protrusion into the construction of "driving part" when the protrusion of the driving part is separately recited in claim 1.  Teva cites *SciMed*

*Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc*., 242 F.3d 1337, 1343 (Fed. Cir. 2001) in support of its construction, but that case is not on point.  The claims in *SciMed* could not be construed to cover catheters with dual (i.e., side-by-side) lumens, because the applicant had disclaimed dual lumens by distinguishing its invention over them in the specification.  *Id.* at 1340-45.  Despite Teva's suggestion, Novo Nordisk's construction does not encompass the "opposite structure" to what is claimed, as was attempted in *SciMed*.  *Supra* at 48-49.  To the contrary, Novo Nordisk's construction is consistent with a driving part that has a protrusion.  It simply lacks the redundancy plaguing Teva's construction.

Teva's argument that "the only force the push button experiences is an axial force pushing down on the push button" (*supra* at 49) is technically unsound and contradicted by the intrinsic evidence.  Figure 2 of the '893 patent shows how a user generates multiple forces (at least both radial and axial) by pressing down on the push button.  *See, e.g.*, D.I. 39, Ex. B, '893 patent, Figure 2 (external force at arrow A).  The patent illustrates those forces with arrows, some in the radial direction, and some in the axial direction, directly contradicting Teva's construction.  Indeed, Teva acknowledges the presence of multiple forces through its faulty "conflat[ing]" argument.  *Supra* at 49-50.  The forces exerted on the push button must go somewhere, and the push button alone does not convert all other kinds of force to axial force.  Rather, the push button and the protrusion on the driving part work together to transfer all forces applied by the user to the rest of the device.

Teva argues that Novo Nordisk's construction reciting only "force" must be incorrect because it would encompass "rotational force," and the push button is incapable of rotating.  *Id*.  This argument is a red herring.  Novo Nordisk's construction says nothing of "rotational force," nor does it suggest the push button transfers forces not delivered in the first place.  Simply put,

whatever force is received by the push button is, in turn, transferred by the driving part. Teva would have this court artificially restrict those forces to "axial." But if that were the case, the radial bearings, which "direct forces applied on the periphery of the push button to the driving part," (D.I. 39, Ex. B, '893 patent, col.1, ll.57-61; Fig. 2 at arrows C and D), would not be necessary. The Court should reject Teva's construction and adopt Novo Nordisk's plain meaning construction of "driving part" as a "part that transfers force from the push button."

## V. DISPUTED CLAIM TERMS OF THE RE '956 PATENT

### A. "Driver"

| Term | Claims | Novo Nordisk's Construction | Teva's Construction |
|------|--------|------------------------------|---------------------|
| "driver" | 1, 2, 3, 4 | plain meaning, which is "a part that transfers force from the injection button" | "a disk-shaped or cylindrical component with a helical track on its outer surface" |

#### 1. Plaintiffs' Opening Position

The RE '956 patent describes and claims a mechanism for preventing a user from setting a dose for injection that exceeds the amount of medicine left in the pen. *See* D.I. 39, Ex. C, RE '956 patent at Abstract. The patent makes clear that the "driving part" transfers force that a user applies to the injection button. *Id.* at col.3, ll.56-65 ("When the injection button [16] is pressed . . . driver [9] will be rotated. . . and will drive the piston rod [3] into the cartridge."); col.4, ll.38-50 ("When the dose is injected by pressing [the] injection button[,] . . . rotation will be transmitted to the driver."); col.2, ll.19-22 ("[The] dose is injected by rotating back the dose setting member which. . . rotate[s] this driver element which moves the piston rod."). That is the plain meaning of the term to a person of ordinary skill in view of the intrinsic evidence, and is Novo Nordisk's construction: "a part that transfers force from the injection button."

Teva's proposal—"a disk-shaped or cylindrical component with a helical track on its outer surface"—is redundant and confusing. Claims 1 and 2 separately describe the driver's shape in other limitations: "the driver is disk-shaped" in claim 1, and "the driver is cylindrical" in claim 2. Teva's reference to the driver's shape into its construction is therefore unnecessary, redundant, and confusing. Similarly, both claims separately describe the driver's track—it "has a spiral shape" in claim 1 and "has a helical shape" in claim 2. Teva's proposal that the driver be a "component with a helical track" is redundant of the other limitation in claim 2 and, in fact, contrary to claim 1's "spiral shape" limitation. A redundant, confusing construction that conflicts with other limitations cannot be correct. *See W.L. Gore*, 2014 U.S. Dist. LEXIS 110140, at *33-34; *Novartis*, 2013 U.S. Dist. LEXIS 165317, at *14-15.

### 2.    Defendant's Answering Position

The '956 Patent claims a "driver" that drives a separate piston rod in order to eject medicine from the injection device. Claim 1 discloses a driver that is "disk-shaped," and claims 2, 5, 9, and 13 disclose a "cylindrical" driver. (D.I. 39, Ex. C, '956 Patent, claims 1, 2, 5, 9, 13.) Other than a disk or cylinder shape, no other structure is disclosed for the driver in either the claim language or specification. Likewise, in these same claims, a helical "track" is provided on the outer surface of the driver facing the dose setting member. (*Id.*) This structure is confirmed by the specification, where there is no disclosure of a driver that does not have a helical track on its outer surface. (*Id.* at 2:23-56; 3:66-4:4; 4:17-33.) Accordingly, a POSA would understand "driver" to be either "diskshaped" or "cylindrical," and have a "helical track" on its outer surface.

Novo's proposed "plain meaning" construction for the term "driver"— "a part that transfers force from the injection button"— merely again claims the purported function of the driver and fails to provide any limitation to the driver's structure, despite the very specific

structure taught in the '956 Patent.  As mentioned above, the claim language and written description are explicit that the driver is limited to either a disk-shape or a cylinder and must have a track on its outer surface.  Unlike Teva's construction, Novo's purported "plain meaning" is woefully divorced from this structure disclosed in the claims and specification.

Novo's proposed construction that the driver is "a part that transfers force from the injection button" is also literally incorrect.  A POSA would understand this phrase as suggesting that the driver directly receives force from the injection button, which it then transfers to another part.  However, that is the function of the dose setting member, not the driver.  (*See, e.g.,* claim 1 ("the dose is injected by *pressing an injection button which rotates back the dose setting member* which during this rotation carries the driver with it to rotate this driver which moves the piston rod forward").)  Novo ignores this fact by using an ellipsis to replace over six lines of informative text in the *only* intrinsic evidence Novo cites to support its proposed construction. ('956 Patent, 3:55-65.)  Accordingly, the driver transfers force from the dose setting member, not the injection button.  (*Id.*)  Not only is Novo's proposed construction thus inaccurate as applied to the driver but for the reasons above, the dose setting member—another claim term—would also be "a part that transfers force from the injection button."  Because Novo's construction for driver would cover and render another claim limitation redundant, it must be rejected.

Novo's argument that the term "helical" with respect to the "track" conflicts with and excludes additional limitations is also unfounded.  A POSA would understand that "helical" does not exclude or conflict with "spiral," but refers to both shapes.  (Ex. L, Webster's at 1050.)

### 3.    Plaintiffs' Reply Position

Teva faults Novo Nordisk for not incorporating redundant structural detail into its construction of "driver."  *Supra* at 53-54.  But to incorporate structural detail here would not only be unnecessary, but improper.  A person of ordinary skill would understand from the claims

as a whole any needed structural limitations of "driver" because such limitations are already separately and expressly included in the claims. RE '956 patent claims 1 and 2 (and 3, 4, and 16 by dependence) recite whether the driver claimed therein is disk shaped or cylindrical, and recite the shape of the track, making it redundant and improper to incorporate these structural modifiers into the construction of "driver." *See Novartis*, 2013 U.S. Dist. LEXIS 165317, at *14-15; *W.L. Gore,* 2014 U.S. Dist. LEXIS 110140, at *33-34. To incorporate redundant structural limitations here is particularly nonsensical because the limitations vary from claim to claim (i.e., a "disk shaped v. "cylindrical" driver, with a "spiral" v. "helical" track).

Claim 1 shows how Teva's construction of "driver" is factually inaccurate. Teva's construction references a "helical track," but claim 1 provides for a spiral track. Attempting to explain away this inconsistency, Teva cites to a dictionary to argue that a person of ordinary skill would understand "helical" to refer to both "helical" and "spiral." *Supra* at 54, citing Ex L. An extrinsic dictionary definition suggesting that a lay person may understand "helical" and "spiral" to have a similar meaning is irrelevant and does not lend support to Teva's faulty construction. The specification is "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582). Here, the specification clarifies that helical and spiral have two distinct meanings, used in two separate embodiments of the invention. D.I. 39, Ex. C, RE '956 patent, col.2, ll.40-49. A helical shape, as used in this context, is necessarily three dimensional in structure, while a spiral shape can be two dimensional. This distinction is borne out by the figures of the patent. *Compare* Figure 2 at 20 showing a two dimensional spiral track *with* Figure 3 at 33 showing a three dimensional helical track. As Teva acknowledged in its Answering Brief, "the intrinsic record 'trump[s] an inconsistent dictionary definition.'" *Supra*

at 29 (citing *Kumar*, 351 F.3d at 1367-68).  For this reason alone, Teva's construction of "driver" cannot be correct.

Teva's argues that Novo Nordisk's construction would be understood to mean that the driver "directly receives force from the injection button."  *Supra* at 54.  But Teva does not explain why a person of ordinary skill would understand "transfer" to mean "directly receive," as Teva claims.

According to Teva, the dose setting member is actually the component from which the driver transfers force.  *Supra* at 54.  The intrinsic evidence cited in Novo Nordisk's Opening Brief explains the relationship between the injection button, dose setting member, and the driver. The dose setting member is a component that is "rotat[ed] back" between the injection button, where the force originates, and the driver, "which moves the piston rod."  *See* D.I. 39, Ex. C, RE '956 patent, col.2, ll.19-22.  Novo Nordisk does not "ignore" the dose setting member, as Teva argues.  *Supra* at 54.  And because "transfer" does not mean "directly receive," its placement between the injection button and the driver does not prevent the driver from transferring force originating at the injection button.  Novo Nordisk's construction of driver as "a part that transfers force from the injection button" is supported by the intrinsic evidence and should be adopted by the Court.

B.    "Track"

| Term | Claims | Novo Nordisk's Construction | Teva's Construction |
|------|--------|----------------------------|---------------------|
| "track" | 1, 2 | plain meaning, which is "a path along which a part moves" | "a helical groove on the outer surface of the driver" |

### 1.    Plaintiffs' Opening Position

The intrinsic evidence indicates that the "track" is a path along which another part, the "track follower," moves. This is clear from the claims themselves:

- **claim 1**: the "track has a spiral shape" and "the track follower can move radially when it follows the track"

- **claim 2**: the "track has a helical shape" and "the track follower can be moved rotationally when it follows the track"

- **claim 5**: the mechanism has "a helical track . . . wherein the follower moves along the helical track"

Novo Nordisk's proposed construction flows from this controlling intrinsic evidence. *Phillips*, 415 F.3d at 1312 ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."). Novo Nordisk's construction is also confirmed by the general knowledge available to a person of ordinary skill in the form of the extrinsic evidence. *See* Ex. G (*Track*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1995)) at 1250 (defining "track" as "the course along which something moves"); Ex. H (*Track*, WEBSTER'S NEW WORLD DICTIONARY (3d ed. 1988)) at 625 (defining "track" as "a path or trail"); Ex. I (*Track*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (3d ed. 1996)) at 1416 (defining "track" as "a course of or line of motion or action").

Teva's proposal should be rejected for the same reasons as those described with respect to the term "driver:" incorporating "helical" in the construction of "track" conflicts with claim 1 (reciting "the track has a spiral shape") and is redundant of claim 2 (reciting "the track has a helical shape").

### 2. Defendant's Answering Position

As used in the context of the '956 Patent, "track" has a very specific definition. A POSA would understand "track" to refer to "a helical groove on the outer surface of the driver." This is supported by the specification and drawings that disclose grooved depressions on the outer surface of the driver into which a track follower engages:



The track is further limited to either a "spiral" or "helical" shape, and a POSA would understand that these shapes may both be described as "helical." (Ex. L, Webster's at 1050; *see* D.I. 39, Ex. E, '956 Patent File History, Nov. 21, 2008 Amendment at 18 (NNVICT00011375) ("Note that by definition a thread is helical.").)

Novo proposes a vague "plain meaning" to broadly describe an invention that is narrower than the claim language might imply in light of the patent as a whole. The claimed invention comprises multiple "paths along which a part moves": a helical ridge on the inner surface of the device housing along which the dose setting member moves; a helical path on the outer surface of the dose setting member along which the housing moves; a ridge on the inner wall of the dose

setting member along which the track follower moves; a helical track on the outer surface of the driver along which a track follower moves, etc. But the term "track" is used in the '956 Patent to refer specifically to the helical track on the outer surface of the driver. ('956 Patent, claims 1, 2, 4-9, 11-13, 15, 18.) Novo's construction introduces confusion by applying a definition that describes multiple "tracks" within the device and should be rejected.

### 3. Plaintiffs' Reply Position

Teva's construction of "track" as a "helical groove on the outer surface of the driver" suffers from many of the same flaws as its construction of "driver," and should be rejected. As described *supra* helical and spiral have separate meanings and a person of ordinary skill would understand from the specification that they are not interchangeable. Applicant's statement during prosecution that "by definition a thread is helical" (*supra* at 58) is of no significance because the patent only uses "thread" in connection with the track when describing the helical version of the track. *See e.g.,* D.I. 39, Ex. C, RE '956 patent, col.2, ll.45-52; claims 4, 7, 9, 11, 12, and 13 (each involving a helical track).

Teva criticizes Novo Nordisk's construction as too broad, identifying other components of the invention that Teva asserts could be described as "paths along which a part moves." *Supra* at 58. Be that as it may, the components Teva identifies are not called "track," and they would be readily distinguishable from the "track" by a person of ordinary skill. These other components are not claim terms; they are not even taken verbatim from the specification. They are simply Teva's own characterization of components of the invention.

Teva argues that Novo Nordisk's construction "introduces confusion by applying a definition that describes multiple 'tracks' within the device." *Supra* at 58. There is only one component of the device referred to as a "track," and a person of ordinary skill in the art, in view of the specification and the claims, would not suffer from Teva's apparent confusion. It is Teva

59

that seeks to sow confusion concerning Novo Nordisk's straightforward construction to distract from the glaring flaws of its own.

### C.    "Track Follower"

| Term | Claims | Novo Nordisk's Construction | Teva's Construction |
|------|--------|------------------------------|----------------------|
| "track follower" | 1, 2, 4 | plain meaning, which is "a part that moves along a path" | "movable lever that follows a pre-defined path and is coupled to the dose setting member" |

### 1.    Plaintiffs' Opening Position

Consistent with the plain meaning of "track," a person of ordinary skill would have understood that the plain meaning of "track follower" is a "part that moves along a path." *See supra* Section V.B.  No further construction is needed.  Teva's proposal improperly restricts "track follower" to a "lever."  But the term "lever" does not appear even once in the intrinsic record, and in dependent claim 4, "the track follower comprises a nut shaped member"—i.e., *not* a lever—as seen in Figure 3 (at right, in orange).  *See also* D.I. 39, Ex. C, RE '956 patent at col.4, ll.27-28 ("[b]etween the dose setting member 30 and the driver 31 a nut member 32 is coupled"); col.4, ll.37-38 ("the position of the nut member 32 on the driver is dependent on the dose set"). Furthermore, Teva's proposed requirement that the track follower be "coupled to the dose setting member" is improperly redundant of claim 2, which recites "and which track is engaged by a track follower coupled to the dose setting member."  *See Novartis,* 2013 U.S. Dist. LEXIS 165317, at *14-15 (rejecting redundant construction); *W.L. Gore,* 2014 U.S. Dist. LEXIS 110140, at *33-34 (same).



Fig. 3

## 2.    Defendant's Answering Position

As introduced above, the '956 Patent claims a "track follower" that moves on a helical track on the outer surface of the driver, and is coupled to the dose setting member in order to move when a dose is being set.  ('956 Patent, 2:23-40.)  This track follower moves along the track on the driver until it eventually reaches the end of the track, at which point it abuts the end wall of the track and encounters a resisting force.  (See, e.g., '956 Patent, 2:35-39 ("The length of the track is so adapted that the [track follower] reaches the end of the track."); 4:11-16; 4:55-59.)  Because the track follower is coupled to the dose setting member, this force from the track wall is experienced at the opposite end of the track follower in the form of a resisting force against the dose setting member as the user attempts to continue setting a dose.  A POSA would understand that this describes a lever.  Accordingly, Teva's construction conforms with the claim language and specification of the '956 Patent and describes how a POSA would understand the term "track follower."

Novo's proposed construction of "a part that moves along a path" is vague and ambiguous such that it improperly broadens the scope of the term beyond the invention disclosed in the '956 Patent.  As described above, there are multiple "paths" in the claimed device, and accordingly multiple parts that move along these paths.  But "track" specifically only refers to the path on the driver.  Novo's broad definition of "track follower" would not be constrained to a follower on the driver's track and is therefore inconsistent with the claims and specification as a whole and should be rejected.

## 3.    Plaintiffs' Reply Position

Teva's attempts to justify inclusion of "lever" in its proposed construction fall flat.  *Supra* at 60-61.  The intrinsic evidence does not reference a "lever," nor does Teva suggest that it does. It has no place in the construction of "track follower."  Additionally, independent claims 1 and 2

expressly recite that the "track follower" is "coupled to the dose setting member." It is redundant and improper for Teva to include this limitation in the construction of "track follower." *See Novartis Pharms.*, 2013 U.S. Dist. LEXIS 165317, at *14-15; *W.L. Gore*, 2014 U.S. Dist. LEXIS 110140, at *33-34.

The parties do not disagree that the "track follower" moves along the "track" (*supra* at 60-61), and yet Teva's constructions of the two terms are inconsistent. Teva's construction of "track" improperly limits the term to a "helical groove," while its construction of "track follower" would allow the follower to move along a "pre-defined path." In criticizing Novo Nordisk's construction of "track," Teva clearly takes the position that "path" is broader than "helical groove." But Teva offers no reason for the track along which the follower moves to be construed more broadly than the track itself. The inconsistency between Teva's constructions of these two terms further confirms that they cannot be correct.

Teva criticizes Novo Nordisk's construction of "track follower" as too broad because "there are multiple 'paths' in the claimed device," and Novo Nordisk's construction, which references a "path," would not be limited to a follower on the "track." *Supra* at 61. This argument fails at least because the same criticism would apply equally to Teva's construction, which also would have the "track follower" move along a "path."

The Court should adopt Novo Nordisk's plain meaning construction for "track follower" as a "part which moves along a path." Novo Nordisk's construction is supported by the intrinsic evidence and, unlike Teva's construction, is consistent with Novo Nordisk's construction of "track" as "a path along which a part moves."

### D.    "Track Having a Length"

| Term | Claims | Novo Nordisk's Construction | Teva's Construction |
|---|---|---|---|
| "track having a length" | 1, 2 | "the length of the track that the track follower can move along" | Plain and ordinary meaning. |

### 1.    Plaintiffs' Opening Position

The claims of the RE '956 patent cover a mechanism that prevents setting of a dose that exceeds the injectable amount of liquid left an injection device. *See* D.I. 39, Ex. C, RE '956 patent, claims 1 & 2. The patent explains that the position of the track follower along the length of the track reflects the total amount of medicine administered. *See id.* at col.4, ll.4-11 ("during the setting of a dose . . . the cam is moved along the track 20 . . . [and] the position of the cam in the track reflects the total amount of medicine administered"); col.4, ll.55-59 ("When the length of the helical track 33 in the driver 31 is adapted to the amount of medicine in a cartridge the nut member 32 will reach the end of the track 33 and stop for setting a dose larger than the amount remaining in the cartridge."). It is this relationship between the position of the track follower on the track and the overall amount of medicine in the pen which enables the mechanism to prevent setting of too great a dose. *See* D.I. 39, Ex. E at NNVICT00011368-69. The prosecution history makes clear that it is not the *total* length of the track present in the device, but "the length [of track] *which the follower can move along*"—potentially something shorter than the total track length—that "defines the volume of the drug that remains in the pen syringe cartridge" and allows the mechanism to prevent setting too large a dose. *Id.* (emphasis added); D.I. 39, Ex. E at NNVICT00011369 at n.6. Accordingly, the proper construction of "track having a length," as understood by a person of ordinary skill in light of the intrinsic evidence, is "the length of the track that the track follower can move along." *Advanced Fiber Techs. Trust v. J&L Fiber Servs.*,

674 F.3d 1365, 1374 (Fed. Cir, 2012); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).

2.    <strong>Defendant's Answering Position</strong>

As defined in the claims, "track" is a path along which a track follower moves. A POSA would therefore understand "track having a length" to describe the total length of this track. Curiously, of all the terms, Novo does not attempt to apply a "plain meaning" to "track having a length": a phrase containing a previously defined term and a commonly understood phrase.  A component "having a length" has a readily understood meaning and there is no reason to depart from that meaning.

Novo's proposed construction of "track having a length" referring not to the length of the track but rather only to "the length of the track that the track follower can move along" is a significant departure from ordinary meaning and is contradicted by the specification and prosecution history. *Kumar,* 351 F.3d at 1368 (Fed. Cir. 2003).  Nowhere in the claim language, specification, or prosecution history does Novo identify some subsection of track the follower moves along that is shorter than the total length of the track.  But throughout the specification, the '956 Patent *does* teach that it is when "the track follower reaches *the end of the track*" that a higher dose may not be set.  ('956 Patent, Abstract, 2:35-39; 2:50-56; 4:11-16; 4:55-59.)  By "adapting the *length of the track* to the total amount of medicine in the cartridge it is ensured that a dose larger than the amount of medicine remaining in the cartridge cannot be set."  ('956 Patent, 4:11-16; *see also* 2:35-39; 4:55-59.)  Thus the "length of the track" is designed such that the track follower will reach "the end of the track"—and not the end of some as-yet-undisclosed subsection of track—when no medicine is left in the device.

The prosecution history confirms this as well.  Novo distinguished itself above prior art by noting that even though there was a track in the prior art on which a follower moves, "there is

64

no indication whatsoever that the length *of the track* on which [the follower] moves is in anyway related to the amount of useable medication in the pen." (D.I. 39, Ex. E, '956 Patent File History, Nov. 21, 2008 Amendment at 23 (NNVICT00011380); *see also id.* at 15 n.7 (NNVICT00011372) (overcoming rejection above a track in the prior art by arguing that "it"— *i.e.*, the track, and not a mere portion of the track—did not have a length relating to the total amount of medicine in the pen).) Consequently, a POSA would understand "track having a length" to refer to the total length of the track, as it is used on the face of the '956 Patent and at every point throughout its intrinsic evidence. As described consistently throughout the entire '956 Patent, the track follower can and does move along the entire length of track until it reaches "the end of the track." Thus, the length that the track follower can move along is the full length of the track. Novo admits in its briefing that this proposed construction would cover "potentially something shorter than the total track length," which would broaden the meaning of the term beyond that disclosed in the '956 Patent. Accordingly, Novo's flawed proposed construction should be rejected.

### 3. Plaintiffs' Reply Position

The intrinsic evidence that Teva cites in criticism of Novo Nordisk's construction of "track having a length" actually supports Novo Nordisk's proposal. The specification of the RE '956 patent repeatedly speaks of "adapting" the length of track to the amount of medicine left in the cartridge. D.I. 39, Ex. C, RE '956 patent, col.2, ll.35-39; col.4, ll.11-16; col.4, ll.55-59. A person of ordinary skill would understand from the specification that the "length of track" is potentially less than the complete track in the device. If the "length of track" that the follower could move along were always the complete track, the specification would not speak of "adapting" the length or even speak of the track's length separate and apart from the track itself. Instead, the specification would simply reference the track.

Applicant's statement during prosecution distinguishing prior art ("there is no indication whatsoever that the *length of the track on which [the follower] moves* is in anyway related to the amount of useable medication in the pen") also supports Novo Nordisk's proposed construction. *See supra* at 64 (citing NNVICT00011380). This prosecution statement suggests a relationship (and lack thereof in the prior art) between 1) the length of the track on which the follower moves and 2) the amount of medication that can be injected. The statement in no way suggests that the "length of track" must be the complete track.

Plain and ordinary meaning does not adequately capture "track having a length" because the track follower will not always reach the end of the track. Accordingly, the Court should reject Teva's request for plain meaning and construe "track having a length" as "the length of the track that the track follower can move along."

### 4. Defendant's Sur-Reply Position

Much of Novo's Reply Brief argument regarding the '956 Patent is spent belaboring topics Teva previously discussed in Teva's Opening Brief, and so Teva will focus on Novo's unsupported construction for "track having a length."

Though Novo agrees that "[t]he specification is 'the single best guide to the meaning of a disputed term," Novo ignores the fact that the limiter of its "Dose Setting Limiter" invention is explicitly achieved by giving the track a certain "length which is related to the total amount of medicament in the cartridge," ('956 Patent, col. 2, ll.25-26), on which a follower "reaches the end of the track." (*Id.*, col. 2, ll.35-36; col. 4, ll.55-59). This interaction between the follower and length of track could also be described as the follower "abut[tting] the end wall of the track," (*id.* at col. 4, ll.12), or "abut[ting] a stop at the end of the track." (*Id.* at claim 5). The specification and the claims are clear and consistent—the follower travels the full length of the track until it reaches the end.

Novo's point that the specification would not discuss adapting track length if the follower could move along the complete track is meritless.  The "dose setting limiter" result is achieved by giving the track a length related to the amount of medication in the device.  ('956 Patent, col. 2, ll.23-39).  Thus, the length of the track must be discussed as it is an integral element of the device.  However, Novo's point is perhaps taken to mean that the specification could simply state that the follower would reach the end of the track when there is no liquid remaining in the cartridge, rather than discussing traveling a certain length of track. As noted *supra* and in Teva's Opening Brief, the '956 Patent does this repeatedly.  (*Id.* at col. 2, ll.25-26; col. 2, ll.35-36, col.4, ll.12, col. 4, ll.55-59, claim 4).  Novo's argument is therefore wholly contradicted by the specification that it agrees is "the single best guide to the meaning of a disputed term." Accordingly, Novo's forced, litigation-inspired construction should be rejected.

## VI.    CONCLUSION

### A.    Plaintiffs' Position

For the forgoing reasons, the Court should accept Novo Nordisk's proposed claim constructions.

### B.    Defendant's Position

For the forgoing reasons, Teva respectfully requests that the Court adopt its proposed construction.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

SHAW KELLER LLP

*/s/ Maryellen Noreika*
_____
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*/s/ Karen E. Keller*
_____
John W. Shaw (#3362)
Karen E. Keller (#4489)
I.M. Pei Building
1105 North Market Street
12th Floor
Wilmington, DE 19801
jshaw@shawkeller.com
kkeller@shawkeller.com

*Attorneys for Plaintiffs*

*Attorneys for Defendant*

OF COUNSEL:

OF COUNSEL:

Jeffrey J. Oelke
Alison Hanstead
Ryan P. Johnson
John Scheibeler
Laura T. Moran
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200

Leora Ben-Ami
Thomas F. Fleming
Gregory Springsted
Robert Hyberg
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-5943

April 25, 2018